# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

WHITE COAT WASTE PROJECT,

        Plaintiff,

v.                                      **Civil Action No. 3:17cv719**

GREATER RICHMOND TRANSIT COMPANY,

        Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Greater Richmond Transit Company's ("GRTC") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)[1] (the "Motion to Dismiss"). (ECF No. 8.) Plaintiff White Coat Waste Project ("White Coat") responded, and GRTC replied. (ECF Nos. 13, 14.) Accordingly, the matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[2] For the reasons that follow, the Court will deny the Motion to Dismiss.

---

[1] Federal Rule of Civil Procedure 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Complaint alleges First Amendment and Fourteenth Amendment violations. (ECF No. 1.)

# I. Factual and Procedural Background

## A.     Summary of Allegations in the Complaint[3]

White Coat describes itself as a "bipartisan non-profit taxpayer watchdog organization"

that seeks to "unite animal-lovers and liberty-lovers to expose and end wasteful taxpayer-funded

animal experiments." (Compl. ¶ 3, ECF No. 1.)  In support of this mission, White Coat currently

operates a campaign "to end taxpayer funding for dog experiments at the Richmond Hunter

Holmes McGuire VA Medical Center," (the "Medical Center")."[4]  (*Id.* ¶ 8.)

White Coat describes GRTC as "a government entity owned by the City of Richmond

and Chesterfield County that provides public transportation in the Richmond area." (*Id.* ¶ 4.)

GRTC "sells advertising opportunities in and on GRTC buses."[5]  (*Id.* ¶ 5.)  GRTC's Advertising

Policy (the "Advertising Policy" or "Policy")[6] prohibits various types of advertisements,

---

[3] For purposes of the Motion to Dismiss, the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to White Coat. *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

[4] Although the factual allegations about the Medical Center's activities do not affect the claims at issue before the Court, they provide helpful context.  White Coat alleges that the Medical Center "failed to comply with federal humane care regulations . . . resulting in the deaths of numerous dogs during experiments." (Compl. ¶ 9.)  White Coat alleges it exposed the Medical Center's inhumane practices, resulting in a federal investigation, media coverage, and public interest.  These revelations, White Coat contends, led Congress to introduce a bipartisan bill to "prohibit taxpayers' money from being spent on painful dog experiments at the [Medical Center]." (Compl. ¶ 12.)

[5] According to White Coat, "GRTC uses the services of an out-of-home media company, Media Transit, to manage its advertising sales and placement.  Prospective GRTC advertisers submit proposed advertisements to Media Transit, but GRTC, not Media Transit, makes the decisions about whether a proposed advertisement complies with GRTC's advertising policy." (Compl. ¶ 6.)

[6] White Coat did not attach a copy of the Policy to the Complaint, but GRTC attached a copy to its Motion to Dismiss. (ECF No. 10-1.)  The Court will consider the Advertising Policy because White Coat sufficiently refers to it in the Complaint, it is central to White Coat's claims, and neither party disputes its authenticity. *See Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006).

including "[a]ll political ads." (*Id.* ¶ 7; Advertising Policy 1, ECF No. 10-1.) The Policy does not define the term "political" or describe criteria that GRTC applies to categorize proposed advertisements as political.[7]

As part of White Coat's effort to end taxpayer-funded dog experiments at the Medical Center, White Coat proposed an advertisement (the "Advertisement" or the "White Coat Advertisement") to GRTC that displays three dogs behind bars, pressing their snouts through the bars. A heading next to the dogs states "Prisoners * Of * Waste," in large white lettering, followed by, "McGuire VA Medical Center: Stop Taxpayer-Funded Dog Experiments!" (Compl. ¶ 13.) A smaller textbox near the bottom states: "Paid for by White Coat Waste Project WhiteCoatWaste.org." (*Id.*)

On March 22, 2017, the PUBLIC Foundation[8] (the "Public Foundation") contacted GRTC's advertising vendor to place the Advertisement with GRTC, on behalf of White Coat. GRTC ultimately rejected the Advertisement "pursuant to its prohibition on 'political ads.'" (*Id.* ¶ 14.) White Coat then contacted GRTC's Director of Communications. White Coat explained that the Advertisement constituted a public education advertisement, described White Coat as a bipartisan nonprofit, and asked for clarification about how GRTC defines the term political ad.

---

[7] In briefing, GRTC purports to rely on the first definition of "political" in Webster's New Collegiate Dictionary: "of or relating to government, a government, or the conduct of a government." (Mem. Supp. Mot. Dismiss 12–13, ECF No. 9 (quoting Webster's New Collegiate Dictionary 883 (1981)).) GRTC also mentions additional definitions: "concerned with the making as distinguished from the administration of governmental policy" and "of, relating to, or involving politics and esp[ecially] party politics." (*Id.* at 12 n.3 (quoting Webster's New Collegiate Dictionary 883 (1981)).) It is not clear GRTC advances its case by putting forth these varying definitions.

[8] White Coat describes the Public Foundation as "a non-profit media organization that works to pair media space with social-change non-profits in local, national, and global markets." (Compl. ¶ 14.)

According to White Coat, the GRTC Director of Communications responded that "educational issue advertisements could be considered public service advertisements ["PSA"], which GRTC does run 'from local jurisdictional offices.'" (*Id.* ¶ 15 (attributing the quoted language to the GRTC Director of Communications).) The Director also stated that if White Coat "partnered, for example, with the City of Richmond's Animal Care and Control, and this is a PSA in conjunction with a local jurisdiction's public education campaign," GRTC would likely run the Advertisement. (*Id.* (quoting the GRTC Director of Communications).)

White Coat states, "[o]n information and belief, GRTC has rejected numerous issue advertisement[s] based on its 'political ads' prohibition." (*Id.* ¶ 16.) For example, White Coat alleges that in January 2016, GRTC initially ran an advertisement (the "Chickpea Advertisement") that "advocated keeping fast food restaurants out of hospitals," but ultimately withdrew the Chickpea Advertisement based on the Advertising Policy's prohibition against political ads. (*Id.* ¶¶ 17–18.) The Chickpea Advertisement displayed three individuals in lab coats holding up three signs which together read, "EAT MORE CHICKPEAS!" (*Id.* ¶ 17 (capitalization in original).) In large white lettering it also stated: "Ask your local hospital to go #FastFoodFree!" (*Id.*) Small text along the bottom stated: "Paid for by Physicians Committee for Responsible Medicine." (*Id.* (capitalization altered from original).) The Complaint describes other advertisements rejected as violating the Advertising Policy's prohibition against political ads, including advertisements related to healthcare in Virginia and pregnancy counseling by a religiously-affiliated organization. (*Id.* ¶¶ 19, 23.)

White Coat alleges, on the other hand, that GRTC advertised the 2016 Vice Presidential debate held at Longwood College in Farmville, Virginia (the "Vice Presidential Advertisement"). According to White Coat, GRTC claimed the Vice Presidential Advertisement

did not violate its prohibition on all political ads because "all political parties [were] invited to participate, it is neutral and state-approved[. . . and] does not advertise a political message for any perspective." (*Id.* ¶ 20 (quoting an unspecified source).) White Coat also alleges that GRTC ran advertisements related to AIDS/HIV testing, autism awareness and events, and a university-sponsored multi-cultural festival.

## B.    Procedural History

White Coat brings this action against GRTC pursuant to 42 U.S.C. § 1983,[9] asserting violations of the First and Fourteenth Amendments.[10]  First, Count I (the "Viewpoint Discrimination Claim") alleges that "GRTC's refusal to run [White Coat's] advertisement amounts to discrimination on the basis of content and/or viewpoint in violation of the First and Fourteenth Amendments to the United States Constitution." (*Id.* ¶ 39.)  Second, Count II (the "Vagueness Claim") challenges the Advertising Policy as unconstitutionally vague, in violation of the Fourteenth Amendment, because the Policy "is not clearly defined such that a person of ordinary intelligence can readily determine whether an advertisement is allowable or prohibited." (*Id.* ¶ 43.)  GRTC filed the Motion to Dismiss, claiming neither count can survive a Rule 12(b)(6) challenge.[11]  White Coat responded and GRTC replied.

---

[9] Section 1983 provides a private right of action for a violation of constitutional rights by persons acting under the color of state law. *See* 42 U.S.C. § 1983.  White Coat alleges GRTC violated its First and Fourteenth Amendment rights.

[10] The First Amendment states, in relevant part: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  The Fourteenth Amendment extended this prohibition to the states. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).  The Fourteenth Amendment states, in relevant part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV.

[11] The Motion to Dismiss also argues against granting a preliminary injunction, claiming White Coat has not justified granting such relief.  White Coat did not move for a preliminary injunction, so the Court disregards that portion of the Motion to Dismiss.

## II. Federal Rule of Civil Procedure 12(b)(6) Standard

In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Matkari*, 7 F.3d at 1134; *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Martin*, 980 F.2d at 952 (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). Instead, a plaintiff must assert facts that rise above speculation and conceivability to those that "show" a claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 570; Fed. R. Civ. P. 8(a)(2)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Therefore, in order for a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts

sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citations omitted).

"If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). However, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint [without converting a Rule 12(b)(6) motion into one for summary judgment] so long as the authenticity of these documents is not disputed." *Witthohn*, 164 F. App'x at 396–97 (citations omitted). "When matters outside the pleadings are presented in a *response* to a 12(b)(6) motion, a district court has discretion to exclude the additional material." *Lawson v. Miles*, No. 1:11cv949, 2012 WL 3242349, at *4 (E.D. Va. Aug. 6, 2012) (emphasis added) (citations omitted).[12]

### III. Analysis: Viewpoint Discrimination Claim

White Coat's Viewpoint Discrimination Claim survives Rule 12(b)(6) scrutiny. First, White Coat plausibly alleges that it may bring a claim against GRTC pursuant to § 1983. Next, White Coat states sufficient facts to conclude that, for the purpose of a Rule 12(b)(6) challenge,

---

[12] GRTC attaches two documents to its Motion to Dismiss. As discussed, *supra* note 6, the Court will consider the Advertising Policy. The Court will not consider the second document GRTC attached to its Motion to Dismiss, (ECF No. 10-2), which GRTC describes as a Virginia State Corporation Commission record showing "that GRTC is a stock corporation." (Mem. Supp. Mot. Dismiss 5.)

Although GRTC offers this document as related to White Coat's allegation that Richmond City and Chesterfield County own GRTC, the document itself provides no information about GRTC's ownership. The Court will not consider the document because it is not central to White Coat's claims and White Coat does not refer to it in the Complaint. *See Witthohn*, 164 F. App'x at 396–97; *see also Lawson*, 2012 WL 3242349, at *4.

GRTC violated the First and Fourteenth Amendments when it refused to run the White Coat Advertisement. For these reasons, the Court will deny the Motion to Dismiss as to Count I, the Viewpoint Discrimination Claim.

### A. Applicable Law

White Coat brings this § 1983 action alleging that GRTC engaged in viewpoint discrimination against White Coat when GRTC refused to run the Advertisement, in violation of the First and Fourteenth Amendments.

#### 1. Actions Under Section 1983

Section 1983 provides a private right of action for a violation of constitutional rights by persons acting under the color of state law. *See* 42 U.S.C. § 1983. Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Section 1983 is not itself a source of substantive rights, but rather provides a vehicle through which plaintiffs may challenge alleged deprivations of their constitutional rights. *See generally Carey v. Piphus*, 435 U.S. 247, 253 (1978) (stating that § 1983 "was intended to '[create] a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secure[d]' to them by the Constitution" (quotation omitted)). In broad terms, to state a claim under § 1983, "a plaintiff must establish three elements . . . : (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997); *see also Brown v. Mitchell*,

308 F. Supp. 2d 682, 692 (E.D. Va. 2004) (citations omitted) ("[A] plaintiff must show that the defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury.").

When a plaintiff brings a Section 1983 claim against a government entity such as a municipality, liability attaches only if "an official policy or custom" caused the "unconstitutional deprivation of the plaintiff's rights." *Brown v. Mitchell*, 308 F. Supp. 2d. at 692 (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)).

> A policy or custom for which a municipality or government entity may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or[,] (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).

### 2.     The Government's Right to Regulate Speech in Different Fora

Although the First Amendment protects many forms of speech, "the government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). The Supreme Court of the United States long has recognized that states may regulate the "time, place, and manner of expression," without running afoul of the First Amendment, subject to certain requirements. *See, e.g.*, *Perry*, 460 U.S. at 45. The requirements vary depending on the forum. *Id.*; *see also Krishna*, 505 U.S. at 678–79.

First, "regulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny." *Krishna*, 505 U.S. at 678. This

quintessential public forum includes "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). "Reasonable time, place, and manner restrictions are allowed [in this quintessential public forum], but any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest, and restrictions based on viewpoint are prohibited." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (internal citations omitted). A government entity may create a designated public forum, subject to the same level of strict scrutiny, "if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Id.* (citing *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)).

Courts have recognized two additional kinds of fora subject to a lower standard of scrutiny. First, a government entity may create a limited public forum "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Id.* at 470; *see also Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Schs.*, 457 F.3d 376, 382 (2006) (articulating the distinctions between a designated public forum and a limited public forum). In a limited public forum, "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." *Id.* at 470 (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001)).

All other government property constitutes a nonpublic forum, "subject to the same two limitations [as a limited public forum]: the policy must be reasonable and viewpoint neutral." *Child Evangelism*, 457 F.3d at 383 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S.

666, 680 (1998); *Perry*, 460 U.S. at 46). Ensuring viewpoint neutrality "requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *Id.* at 384 (emphasis in original) (citing *Bd. of Regents v. Southworth*, 529 U.S. 217, 235 (2000)).

B.      **White Coat Plausibly Alleges that GRTC Constitutes a Government Actor**

GRTC claims it could not have acted under color of law within the scope of § 1983 because it "is not a government actor." (Mem. Supp. Mot. Dismiss 1.) GRTC argues that White Coat fails to plausibly allege facts demonstrating that GRTC acted under color of law because White Coat's claim "that GRTC is a 'government entity,' *ipse dixit*, is simply not enough, even when coupled with an assumption that GRTC is wholly owned by the City of Richmond and Chesterfield County and substantially funded by them and other government entities." (*Id.* at 7.) GRTC misapprehends the analysis the Court undertakes at this stage of the case. Considering all factual allegations in the Complaint in the light most favorable to White Coat, as the Court must when deciding a Rule 12(b)(6) Motion to Dismiss, the Court finds that White Coat plausibly alleges facts, evaluated below, supporting a reasonable inference that GRTC constitutes a government actor.[13]

In support of its contention that GRTC acted "under color of law" for purposes of § 1983, White Coat alleges three pertinent facts: GRTC is (1) a government entity; (2) owned by the City of Richmond and Chesterfield County; that (3) provides public transportation in the Richmond area. (Compl. ¶ 4.) Although these factual allegations may be minimal, a plaintiff need not prove its case at the pleading stage. *See Twombly*, 550 U.S. at 570; *see also Iqbal*, 556

---

[13] Because the Court finds that White Coat plausibly pleads that GRTC constitutes a government actor, the Court does not address the parties' arguments regarding First Amendment infringements by private actors.

U.S. at 678. These statements "nudge" White Coat's allegations "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 678.

GRTC does not contest whether the City of Richmond and Chesterfield County own GRTC,[14] and public records support this conclusion.[15] GRTC unquestionably provides public transportation, traditionally a government-provided service. GRTC only disputes White Coat's

---

[14] Although GRTC does not challenge government ownership, GRTC asserts that it "is a stock corporation," and that government ownership "does not convert a company or business into a 'government entity' or municipality." (Mem. Supp. Mot. Dismiss 5.) In support, GRTC relies on *Appalachian Power Co. v. Greater Lynchburg Transit Co.*, 236 Va. 292 (1988), a case of limited relevance to these proceedings. In *Appalachian Power*, the Supreme Court of Virginia discussed whether a government-owned transportation company or "installation" fell within the meaning of the term "City" given the context of the use of those words use in a franchise agreement. *Id.* The *Appalachian Power* court reviewed those terms for the narrow purpose of resolving the contractual issue before the state court. *Id.* Its holding does not extend to the facts of this case.

GRTC also asserts that government funding does not convert a corporation into a state entity. This argument falters for two reasons. First, White Coat's allegations that GRTC amounts to a government actor do not rely on GRTC's funding source. And regardless, the cases GRTC relies on in support of this proposition are inapposite: they involve private actors performing traditionally private functions, such as providing insurance, or operating nursing homes. *See generally, e.g.*, *German v. Fox*, 267 Fed. Appx. 231 (4th Cir. 2008) (nursing home); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999) (worker's compensation insurers).

[15] White Coat does not attach exhibits to the Complaint in support of its position that Richmond City and Chesterfield County own GRTC, but GRTC does not contest this claim, instead stating that the allegation "is buttressed by information contained on GRTC's website." (Mem. Supp. Mot. Dismiss 5 n.1 (providing a web link to GRTC's website).) GRTC's website describes GRTC as "[j]ointly owned by the City of Richmond and Chesterfield County." GRTC Transit System, http://ridegrtc.com/about-us/overview/ (last visited Sept. 18, 2018).

Federal Rule of Evidence 201 permits a court to take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court could never, at this time, find that *all* websites provide a "source whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2). But this is GRTC's website and both parties refer to it. (*See* Mem. Supp. Mot. Dismiss 5 n.1; Resp. Mot. Dismiss 4, ECF No. 13.)

The Court concludes that the accuracy of GRTC's website cannot reasonably be questioned for the limited purpose of identifying the owners of GRTC, especially given that both parties rely on the website for this information. The Court takes judicial notice, then, that Richmond City and Chesterfield County own GRTC. FRE 201(b)(2); *see also* GRTC Transit System, http://ridegrtc.com/about-us/overview/ (last visited Sept. 18, 2018).

characterization of GRTC as a government entity, describing this claim as conclusory and not entitled to deference. But White Coat does not make this claim in isolation.

Rather, White Coat's alleges: (1) the City of Richmond and Chesterfield County own GRTC; and (2) GRTC provides public transportation services. These factual allegations support the reasonable inference that GRTC amounts to a government entity subject to § 1983. *See generally, e.g., Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) (finding that Amtrak constitutes a government actor for First Amendment purposes).[16] "[J]udicial experience[17] and common sense," support this conclusion. *Iqbal*, 556 U.S. at 679. For the purpose of this Rule 12(b)(6) challenge, White Coat plausibly claims that GRTC acted under color of law within the meaning of § 1983.

---

[16] In *Lebron*, the Supreme Court considered whether Amtrak qualified as a government actor for First Amendment purposes, ultimately finding that it did. 513 U.S. at 383–400. It analyzed a well-developed factual record, which this Court lacks because proceedings have just commenced. *Id.* The Supreme Court considered the history of passenger rail, the history of government-owned and government-controlled corporations, the congressional statute that created Amtrak, and Amtrak's organizational structure before concluding that Amtrak "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." *Id.* at 394.

GRTC cites *Lebron* to argue that White Coat failed to allege sufficient facts to show that GRTC constitutes a government actor. GRTC's argument fails because White Coat's factual allegations provide the sufficient "nudge" that *Twombly* and *Iqbal* require to survive a Rule 12(b)(6) challenge.

[17] White Coat cites to sixteen circuit-level cases in which plaintiffs challenged regulations of speech in different kinds of public transportation settings as violating the First Amendment pursuant to § 1983. (Resp. Mot. Dismiss 13 (citing cases).) All of these court decisions presumed that § 1983 applied. *See generally, e.g., NAACP v. City of Philadelphia*, 834 F.3d 435 (3d Cir. 2016); *Am. Freedom Def. Initiative v. King Cnty.*, 796 F.3d 1165 (9th Cir. 2015). GRTC cites to no case in which a government-owned transportation company has successfully argued that § 1983 does not apply to it because of its particular organizational or managerial structure.

## C.     White Coat Plausibly Alleges that the Advertising Policy Lacks Viewpoint Neutrality

GRTC argues in the Motion to Dismiss that, even if it constitutes a government actor within the scope of § 1983, White Coat's Viewpoint Discrimination Claim must falter because White Coat has failed to plead facts sufficient to support a claim that GRTC violated White Coat's First and Fourteenth Amendment rights.  Because White Coat has pled facts supporting the plausible inference that (1) GRTC's advertising spaces are a nonpublic forum,[18] and that (2) GRTC's restrictions on speech are not viewpoint neutral,[19] White Coat has plausibly stated a claim that the Advertising Policy violates the First Amendment.  For the reasons stated below, the Court will deny the Motion to Dismiss as to Count I, the Viewpoint Discrimination Claim.

In a nonpublic forum, "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." *Pleasant Grove*, 555 U.S. at 470 (citation omitted); *see also Child Evangelism*, 457 F.3d at 383.  Ensuring viewpoint neutrality requires the government to do more than just "refrain from explicit viewpoint discrimination." *Child Evangelism*, 457 F.3d at

---

[18] Because Richmond City and Chesterfield County own GRTC, the Court draws the reasonable inference, for the purpose of the Rule 12(b)(6) challenge, that GRTC's buses and advertising spaces constitute government property. *See, e.g., Child Evangelism*, 457 F.3d at 381–83.  All government property falls within one of four categories of fora:  traditional public fora, designated public fora, limited public fora, or nonpublic fora. *Id.*  This means White Coat plausibly pleads that GRTC's advertising spaces are, at minimum, a nonpublic forum, which commands a less heightened degree of judicial scrutiny.

Although caselaw strongly supports a finding that GRTC's advertising spaces *only* amount to a nonpublic forum, and not another category of forum entitled to more exacting constitutional scrutiny, *see generally, e.g., Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) (finding that advertisement spaces on public transportation buses do not constitute a public forum), the Court does not foreclose the possibility that White Coat may, on a more developed record, argue for a different categorization of GRTC's advertising spaces.

[19] In a nonpublic forum, "government restrictions on private speech must be *both* reasonable and viewpoint neutral." *Child Evangelism*, 457 F.3d at 383 (emphasis added).  Because the Court finds that White Coat plausibly alleges that the Advertising Policy lacks viewpoint neutrality, the Court need not analyze the Policy's reasonableness.

384. The government entity regulating the speech must "provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *Id.* (citing cases). A policy that allows the government regulator "unfettered discretion . . . does not provide adequate protection for viewpoint neutrality."[20] *Id.* at 378.

Considering the allegations in the light most favorable to White Coat, as it must at this early stage, White Coat plausibly alleges sufficient facts to support a reasonable inference that the Policy grants GRTC officials "boundless discretion" in determining which advertisements to accept or reject. *Child Evangelism*, 457 F.3d at 386. First, on its face, nothing in the Policy appears to constrain GRTC officials' discretion to approve or deny an advertisement. Second, White Coat provides examples that plausibly demonstrate the arbitrary and discriminatory enforcement of the Policy.

The Policy lists fourteen categories of prohibited advertisements, including a ban on all political ads. The Policy does not define the term "political." Instead, it describes the following procedure to determine whether advertisements fall within a prohibited category. First, the "Advertising Contractor[21] shall review each advertisement . . . to determine whether the

---

[20] In *Child Evangelism*, the United States Court of Appeals for the Fourth Circuit struck down a school district's written policy "regarding distribution of materials in public elementary schools," because it expressly gave the school district "unfettered discretion to deny" speakers access to the forum at issue. 457 F.3d at 379, 386. Specifically, the policy in *Child Evangelism* made the school district the "sole entity with the authority to approve flyers for distribution." *Id.* at 380.

Although the policy in *Child Evangelism* articulated specific criteria and objectives that met the reasonableness prong of the forum analysis, the Fourth Circuit found that the school district's ability to ultimately approve, reject, or withdraw previous approvals did not adequately ensure viewpoint neutrality. *Id.* at 386–88. The Fourth Circuit held that "even in . . . nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment." *Id.* at 386.

[21] Nothing in the Policy identifies the "Advertising Contractor." Elsewhere, White Coat claims Media Transit manages GRTC's advertising sales and placement. (Compl. ¶ 6 ("Prospective GRTC advertisers submit proposed advertisements to Media Transit.").)

advertisement falls within, or may fall within, one of more of the" prohibited categories. (Adevrtising Policy 1.) If the Advertising Contractor determines that an advertisement does, or may, fall into a prohibited category, the Advertising Contractor shall submit the advertisement to the GRTC Marketing Department for further review. The GRTC Marketing Department ultimately determines whether the proposed advertisement falls within one of the prohibited categories and advises the Advertising Contractor of its decision.

Nothing in the Policy establishes criteria or processes that the Advertising Contractor or the GRTC Marketing Department must employ to ensure the objective enforcement of the Policy. Although the Policy purports to establish "a viewpoint neutral advertisement standard to be consistently applied and objectively enforced," this statement alone does not suffice to establish the necessary safeguards. (*Id.* at 1.) White Coat alleges it sought direction on how to comply with the Policy and clarification on how GRTC construes the term political, but GRTC's response did not provide a precise definition or clear standards. (Compl. ¶ 15.)

Next, White Coat describes various advertisements that, allegedly pursuant to the Policy, GRTC categorized as either political or not political.[22] Even were the Court to presume that the

---

[22] These examples distinguish the case at bar from *Lehman*, 418 U.S. 298, which GRTC argues controls and should dispose of this case. In *Lehman*, a plurality of Supreme Court justices upheld the constitutionality of a comparable prohibition against political advertisements on buses. *Id.* The policy at issue proscribed "political advertising in or upon any of the said [bus cars] or in, upon or about any other additional and further space granted hereunder." *Id.* at 300 (quoting Shaker Heights Ex. A). A political candidate for state office sought to place advertisements on the Shaker Heights Rapid Transit system in the months leading up to an election. *Id.* at 299.

The political candidate challenged the ban, arguing that the advertising spaces on the transit system "constitute[d] a public forum protected by the First Amendment." *Id.* at 301. The Supreme Court concluded, "No First Amendment forum is here to be found." *Id.* at 304. Applying a less restrictive standard of review, the *Lehman* court found that a "city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles," as long as the regulation is not "arbitrary, capricious, or invidious." *Id.* at 303. Specifically, *Lehman* found a ban on political ads on a public bus system constitutional on the record before it. *Id.* at 303–04.

ban on political ads pertains, as GRTC contends, to content "of or relating to government, a government, or the conduct of a government,"[23] (Mem. Supp. Mot. Dismiss 12–13 (quoting Webster's New Collegiate Dictionary 883 (1981))), these factual allegations would still support a reasonable inference that GRTC has acted in the past with unfettered discretion pursuant to the Policy. For example, White Coat asserts that GRTC rejected the White Coat Advertisement as a "political ad" pursuant to the Policy. (Compl. ¶ 14.) GRTC also determined that the Chickpea Advertisement, advocating against fast food in hospitals, qualified as a prohibited political ad. On the other hand, GRTC approved the Vice Presidential Advertisement, despite its seemingly overt political nature. According to White Coat, GRTC determined that the Vice Presidential Advertisement did not run afoul of the Advertising Policy because "all political parties [were] invited to participate, it is neutral and state-approved[. . . and] does not advertise a political message for any perspective." (Compl. ¶ 20 (appearing to quote an unspecified GRTC source).)

These examples plausibly show that the Advertising Policy, though purporting to establish viewpoint neutrality, fails to "provide adequate safeguards to protect against the improper exclusion of viewpoints." *Child Evangelism*, 457 F.3d at 384 (emphasis omitted).

---

But key factual distinctions exist between *Lehman* and the case at bar. In *Lehman*, "uncontradicted testimony at the trial [indicated] that during the 26 years of public operation, the Shaker Heights system, pursuant to city council action, had not accepted or permitted any political or public issue advertisement on its vehicles." *Id.* at 300–01. The Supreme Court found the policy reasonable because no evidence existed that showed arbitrary, capricious, or invidious enforcement. *Id.* at 304. Here, White Coat plausibly alleges arbitrary or capricious enforcement by enumerating specific examples that lack obvious categorization as political or not.

*Lehman*, though similar in some regards, does not compel the Court to accept all political advertisements bans on all public transportation companies as compliant with the First Amendment. As White Coat points out, a plethora of cases exist tackling the difficult issue of regulating speech in analogous spaces. (Resp. Mot. Dismiss 12–13 (citing cases).) The dispute requires a context-specific analysis based on a more developed record.

[23] Of course, on a Rule 12(b)(6) Motion to Dismiss, the Court views the well-pleaded allegations in the light most favorable to White Coat, not GRTC. *Matkari*, 7 F.3d at 1134.

GRTC's arguments to the contrary do not persuade. Because this means that White Coat plausibly claims that GRTC's Advertising Policy lacks viewpoint neutrality, the Court will deny the Motion to Dismiss as to Count I, the Viewpoint Discrimination Claim.

## IV. Analysis: Vagueness Claim

GRTC challenges White Coat's Vagueness Claim in two ways: (1) the Supreme Court has upheld similarly worded prohibition against political ads;[24] and (2) the term "political" is not vague,[25] as evinced by a clear dictionary definition. Because White Coat has pled facts supporting the plausible inference that the Advertising Policy authorizes or encourages arbitrary and discriminatory enforcement as to its prohibition on political ads, White Coat states a claim for a Fourteenth Amendment violation. The Court will deny the Motion to Dismiss as to Count II, the Vagueness Claim.

### A.    Legal Standard: Unconstitutional Vagueness

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)); *see also Wag More Dogs LLC. v. Cozart*, 680 F.3d 359, 370–71 (4th Cir. 2010). A statute or regulation is unconstitutionally vague if it "fails to give adequate

---

[24] GRTC claims that the Supreme Court's ruling in *Lehman*, upholding a similarly-worded policy, "should be sufficient" to overcome White Coat's vagueness challenge. (Mem. Supp. Mot. Dismiss 12 (citing *Lehman*, 418 U.S. at 300).) But even presuming *Lehman* informs here, the Supreme Court in *Lehman* did not consider a vagueness challenge. Further, a plaintiff may, as here, bring a vagueness challenge based on factual evidence showing arbitrariness and discrimination, so that a policy using similar words may be constitutional under one set of facts and unconstitutional under a different set of facts.

[25] GRTC omits citation to any legal authority that identifies the vagueness standard GRTC seeks to apply in support of its argument.

warning of what activities it proscribes or fails to set out 'explicit standards' for those who must apply it." *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

Because a court "can never expect mathematical certainty from our language," the void-for-vagueness doctrine does not "hold legislators to an unattainable standard when evaluating enactments in the face of vagueness challenges." *Wag More Dogs*, 680 F.3d at 371(citation and internal quotations omitted in original). Rather, courts "ask whether the government's policy is 'set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.'" *Id.* (quoting *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 749 (4th Cir. 2010)).

The limitations of language also mean that "[w]herever the law draws a line there will be cases very near each other on opposite sides." *United States v. Wurzbach*, 280 U.S. 396, 399 (1930). Imprecise language does not necessarily make a statute or regulation unconstitutionally vague. *United States v. Wurzbach*, 280 U.S. 396, 399 (1930). "Dictionary definitions and old-fashioned common sense facilitate the inquiry." *Wag More Dogs*, 680 F.3d at 371 (citing *Imaginary Images*, 612 F.3d at 750; *United States v. Cullen*, 499 F.3d 157, 163 (2d Cir. 2007)).

The void for vagueness doctrine applies to both criminal and non-criminal regulations. *See generally, Morales*, 527 U.S. 41 (overturning a criminal city ordinance as unconstitutionally vague); *see also, Broadrick*, 413 U.S. 601 (considering a civil statute curtailing certain employees' rights to engage in political activity, ultimately finding it constitutional); *Wag More Dogs*, 680 F.3d 359 (analyzing city zoning laws); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426 (4th Cir. 2013) (considering school dress codes).

**B.**     <u>White Coat Plausibly Alleges Facts that Support a Finding of Vagueness</u>

White Coat pleads facts sufficient to support a plausible inference that the Advertising Policy's prohibition on political ads is unconstitutionally vague. First, White Coat's allegations show that the Policy lacks explicit standards for GRTC to follow in determining whether a proposed advertisement falls within the prohibition. Second, White Coat's Complaint plausibly alleges that GRTC enforced the Policy in an arbitrary and discriminatory manner.

A regulation violates the Constitution as impermissibly vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732 (citation omitted); *see also Wag More Dogs*, 680 F.3d at 370–71. A policy can survive a vagueness challenge if it contains "explicit standards" that guide the officials interpreting and applying the policy. *Broadrick*, 413 U.S. at 607 (citation omitted). A party must show "a pattern of discriminatory enforcement" to attack a regulation as vague on the basis of arbitrary enforcement. *Wag More Dogs*, 680 F.3d at 372. Here, White Coat has pled facts that support a plausible inference that GRTC arbitrarily and discriminatorily enforced the Policy's prohibition of political ads.

First, nothing in the Policy seems to sufficiently guide its interpretation and enforcement. The Policy simply prohibits "[a]ll political ads." (Advertising Policy 1.) The Policy does not define the term "political" or provide any guidance on how to determine what constitutes a "political" advertisement.[26] (*Id.*) Although the Policy identifies who determines whether a

---

[26] As identified earlier, GRTC argues the term "political" is not vague. In support, GRTC provides a dictionary definition defining the word "political" as "of or relating to government, a government, or the conduct of a government." (Mem. Supp. Mot. Dismiss 12–13 (quoting Webster's New Collegiate Dictionary 883 (1981)).) In a footnote, GRTC provides several additional definitions of the term "political," but does not claim these definitions are synonymous or sufficiently similar so as to overcome a vagueness challenge. (Mem. Supp. Mot. Dismiss 12 n.3.) In its Response, White Coat provides numerous examples of the varied applications, definitions, and meaning of the term "political" in circumstances that would cloud GRTC's stance. (Resp. Mot. Dismiss 19–21.) GRTC did not address these alternative

proposed advertisement falls within a prohibited category, the Policy does not, on its face, delineate "explicit standards" that would predict how and when the ban on political advertisements might occur. *Broadrick*, 413 U.S. at 607 (citation omitted). Specifically, the Policy states GRTC's intent "not to allow any of its transit vehicles or property to become a public forum for dissemination, debate, or discussion of public issues."[27] (Advertising Policy 1.) This vague intention "fails to set out 'explicit standards' for those who must apply [the Policy]." *Broadrick*, 413 U.S. at 607 (quoting *City of Rockford*, 408 U.S. at 108).

---

definitions, or any of White Coat's counterarguments related to the vagueness claim, in its Reply.

      Even if the Court were to consider only GRTC's proffered dictionary definition, that definition supports the Court's conclusion that the Advertising Policy's prohibition against "[a]ll political ads" fails to set clear enforcement criteria. Applying this definition, GRTC argues the Vice Presidential Advertisement "is not political," because "the subject of the ad is promoting the fact of the forum or debate and, tangentially, Longwood College." (*Id.*) This narrow interpretation of the Policy seems at odds with an unqualified prohibition against any advertisement "of or relating to government."

      For example, White Coat aptly observes that "[o]ne can only speculate how [the Chickpea Advertisement] was 'of or relating to government.'" (Resp. Mot. Dismiss 18.) GRTC also purportedly rejected an advertisement related to pregnancy counseling as political because the organization had religious ties. Nothing in the record indicates how the organization's religious ties fits within the definition "of or relating to government."

      In seeming contrast, GRTC authorized an advertisement related to AIDS/HIV treatment. In its Motion to Dismiss, GRTC states this advertisement did not violate the Policy because it "doesn't mention government and does not advocate for or against any governmental policy." (Mem. Supp. Mot. Dismiss 13.) This explanation does not necessarily square with GRTC's proffered definition of the term "political."

      Instead, it appears GRTC may conflate the word "political" with "partisan." And although "political" may be interpreted to mean "partisan," nothing in the Policy itself adopts this interpretation. And GRTC does not purport to do so in its briefings. On the record before it, the Court finds that these examples plausibly suggest that the Policy failed to set explicit standards to guide the Policy's enforcement. *Broadrick*, 413 U.S. at 607 (citation omitted).

[27] Although not directly relevant to the vagueness analysis, the Court strains to reconcile this stated purpose with GRTC's decision to run the Vice Presidential Advertisement. An advertisement related to a contested election would likely result in "dissemination, debate, or discussion" of an important public issue. (Advertising Policy 1.) "[O]ld-fashioned common sense" supports this conclusion. *Wag More Dogs*, 680 F.3d at 371 (citation omitted).

Additionally, White Coat alleges multiple instances in which GRTC applied the Policy's ban against "[a]ll political ads" in an arbitrary and discriminatory manner. White Coat alleges that GRTC originally approved the Chickpea Advertisement for display on its buses, but then withdrew approval pursuant to the Policy's ban on political advertisements.[28] (Compl. ¶ 17–18.) On the other hand, GRTC displayed the Vice Presidential Advertisement, which promoted the 2016 vice presidential debate during a highly contested election cycle.[29] Especially when viewed in the light most favorable to White Coat, these examples, alongside other GRTC decisions made pursuant to its Advertising Policy,[30] support the reasonable inference that GRTC enforced the Policy in an arbitrary and discriminatory manner, applying different criteria in categorizing advertisements as political or not.

Because White Coat pleads facts supporting the reasonable inference that GRTC applies the Advertising Policy in an arbitrary manner, and that the Policy lacks explicit standards governing its interpretation, White Coat sufficiently states a void-for-vagueness claim. The Court will deny the Motion to Dismiss as to Count II, the Vagueness Claim.

---

[28] Nothing before the Court suggests the Advertising Policy changed during that time.

[29] Even were the Court to assume the Vice Presidential Advertisement was "of or relating to government" in a non-partisan manner, the Court could find that White Coat plausibly pleads facts showing arbitrary and discriminatory enforcement. White Coat alleges GRTC stated the Vice Presidential Advertisement did not violate the Policy because "all political parties [were] invited to participate." (Compl. ¶ 20 (appearing to quote an unspecified GRTC source).) But White Coat plausibly claims it, too, "is a bipartisan" organization, (Compl. ¶ 3), supporting a bill in a bipartisan way. Nothing in the Advertising Policy negates White Coat's position. And nothing before the Court counters, definitively, White Coat's claim of arbitrary and discriminatory enforcement, especially when viewing the allegations favorably to White Coat.

[30] See supra n.26.

## V.  Conclusion

For the foregoing reasons, the Court will deny the Motion to Dismiss.

An appropriate Order shall issue.

_____
/s/
M. Hannah Lauck
United States District Judge

Date: 9/25/18
Richmond, Virginia