**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**WHITE COAT WASTE PROJECT,**

      **Plaintiff,**

**v.**                                     **Civil Action No. 3:17cv719**

**GREATER RICHMOND TRANSIT COMPANY,**

      **Defendant.**

<u>**MEMORANDUM OPINION**</u>

This First Amendment action arises out of Defendant Greater Richmond Transit Company's refusal to air what it deemed a political advertisement by Plaintiff White Coat Waste Project concerning the treatment of test-animals at the Hunter Holmes McGuire VA Medical Center in Richmond, Virginia. This matter comes before the Court on White Coat Waste Project's ("White Coat") Motion for Summary Judgment, (ECF No. 25), and Greater Richmond Transit Company's ("GRTC") Motion for Summary Judgment, (ECF No. 30). GRTC and White Coat responded to the cross-motions for summary judgment. (ECF Nos. 34, 35.) Accordingly, the matter is ripe for disposition.

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[1] For the reasons that follow, the Court will grant in part and deny in part White Coat's Motion for Summary Judgment, and will grant in part and deny in part GRTC's Motion for Summary Judgment.

---

[1] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Complaint alleges First Amendment and Fourteenth Amendment violations. (ECF No. 1.)

# I.  Factual and Procedural Background

White Coat brings this action against GRTC pursuant to 42 U.S.C. §§ 1983 and 1988,[2]

asserting that GRTC's advertising policy (the "Advertising Policy"), which prohibits "political

ads," offends the First and Fourteenth Amendments both facially and as applied to White Coat.[3]

(Compl. 12, ECF No. 1.)  GRTC initially filed a Motion to Dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6)[4] for failure to state a claim.  (GRTC Mot. Dismiss, ECF No. 8).  The

Court denied GRTC's Motion to Dismiss, finding that White Coat had stated a viewpoint

discrimination claim and vagueness claim upon which relief could be granted.  (Sept. 25, 2018

Mem. Op., ECF No. 15.)  The Parties then filed cross-motions for summary judgment, and both

Parties filed responses in opposition.  The Court sets forth below the undisputed facts taken from

the record.

---

[2] Section 1983 provides a private right of action for a violation of constitutional rights by persons acting under the color of state law.  42 U.S.C. § 1983.  Section 1988, titled "Proceedings in vindication of civil rights," directs district courts to exercise jurisdiction over civil and criminal matters alleging violations of civil rights "in conformity with the laws of the United States" and allows for an award of attorney's fees in such actions.  42 U.S.C. § 1988.  White Coat alleges that GRTC, as a state actor, violated its First and Fourteenth Amendment rights and seeks injunctive relief, attorneys' fees, and costs.  (*See generally* Compl., ECF No. 1.)

[3] The First Amendment states, in relevant part:  "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. CONST. amend. I.  The Fourteenth Amendment extended this prohibition to the states.  *See*, *e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).  The Fourteenth Amendment provides, in relevant part:  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. . . ."  U.S. CONST. amend. XIV.

[4] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

A.     <u>**Factual Background**</u>[5]

White Coat describes itself as a "bipartisan non-profit taxpayer watchdog organization" that seeks to "unite animal-lovers and liberty-lovers to expose and end wasteful taxpayer-funded animal experiments." (Compl. ¶ 3.)  In support of this mission, White Coat currently operates a campaign "to end taxpayer funding for dog experiments at the Richmond Hunter Holmes McGuire VA Medical Center," the ("McGuire VA Center").  (*Id.* ¶ 8.)

In 1973, GRTC "was incorporated as a nonprofit corporation 'for the purpose of providing mass transportation [in Richmond and nearby environs] service as a public service corporation."  (White Coat Mot. Summ. J., Strugar Decl., Ex. A, "GRTC Responses and Objections to Plaintiff's First Set of Interrogatories," ECF No. 26-1.)  GRTC's Advertising Policy, as developed, prohibits various types of advertisements, including "[a]ll political ads." (Strugar Decl., Ex. H, "GRTC Advertising Policy.")

---

[5] In recounting the factual history, the Court relates the undisputed facts as articulated in the Complaint and the Parties' briefing on both motions for summary judgment.  In ruling on each motion, the Court will view the undisputed facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In this section, however, the Court merely sets forth the undisputed facts.

1.      <u>History and Ownership Structure of GRTC</u>

In April 1973,[6] the City of Richmond incorporated GRTC "as a nonprofit corporation 'for the purpose of providing mass transportation service as a public service corporation.'"  (GRTC Responses and Objections to Plaintiff's First Set of Interrogatories, Resp. No. 1); (Mem. Supp. GRTC Mot. Summ. J., Ex. G, "Deposition of Sheryl Adams," 15–16, ECF No. 31–7.)[7]  GRTC offers space on the interior and exterior of its buses to advertisers.  (Mem. Supp. GRTC Mot. Summ. J., Ex. H, "Deposition of Carrie Rose Pace," 27, ECF No. 31–8).  As is true for most public transportation systems, GRTC provides its service to the public below cost.  (Adams Dep. 26.)

At the time of GRTC's founding, VTC's employees were unionized, but federal law mandated that federal funds could be made available only to transit operators which preserved "already-existing collective bargaining rights."  (Hurd, *Public Transportation* 26); (Strugar Decl., Ex. C, "GRTC's Answers to Plaintiffs' Second Set of Requests for Admissions," Resp.

---

[6] From 1944 to 1962, the Virginia Transit Company ("VTC") and its holding company, United Transit Company, owned and operated a public transportation services in Richmond and other cities.  (Strugar Decl., Ex. B, William B. Hurd, *Public Transportation in Richmond* 17 (1982).)  This company did not weather wartime deprivations and the transition from streetcar to bus transportation well.  (*Id.* 20–21.)  From 1962–1973, the Virginia Transit Company was still privately held but it became evident, despite federal, state, and local intervention to stave off losses, that the "Richmond system could no longer be expected to meet its expenses out of the farebox, and that it would have to close down in the near future, at least as a private venture."  (*Id.* 21–23, 23.)

As a result, in June 1972, VTC officials met with Richmond city officials to inform them that transportation services would have to discontinue, at the latest, in two years.  (*Id.* 23.)  That same day, "at the end of a scheduled City Council work session, the City Manager was instructed to take steps necessary to preserve the city's transit services."  (*Id.*)

[7] Either party may submit as evidence "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to support a factual assertion made in a motion for summary judgment.  Fed. R. Civ. P. 56(c)(1)(A).  Both parties do so here.

No. 17); (Adams Dep. 37–39.)  Virginia law, however, "prohibit[ed] collective bargaining with the representatives of public employees."  (Hurd, *Public Transportation* 26.)  To resolve this conflict, the Richmond City Attorney and Assistant City Attorney proposed that the "city form a non-profit corporation under the general laws of Virginia, the voting stock of which would be owned by the City of Richmond . . . [so that][8]. . . the U.S. Department of Transportation would— as it did—find that the wholly-owned corporation was an instrumentality of the city and was, therefore, a 'public body' within the meaning of [federal law], eligible to apply for and receive federal grants."  (Hurd, *Public Transportation* 26.)  This public stock corporation structure allowed the former VTC "employees to continue to collectively bargain while also retaining eligibility for federal grant money."[9]  (GRTC's Answers to Plaintiffs' Second Set of Requests for Admissions, Resp. No. 17); (*see also* Adams Dep. 37–39.)

### a.   The Virginia General Assembly Amended the Richmond City Charter in 1973 to Allow for the Creation of GRTC

On March 15, 1973, the General Assembly of the Commonwealth of Virginia "amended the Richmond City Charter to provide that 'the city shall have the power to acquire, operate,

---

[8] GRTC does not concede that it is a "public body" under relevant federal law "solely because it is an 'instrumentality of the City,'" but does concede that it is a "public body" because it is a "'public corporation . . .established under the law of any State.'" (Strugar Decl., Ex. A, GRTC Responses to Plaintiff's First Set of Interrogatories.)  In passing resolutions regarding an application for a federal grant in 1997, GRTC refers to itself as "THE PUBLIC BODY."  (Mem. Supp. GRTC Mot. Summ. J., Ex. A, "RESOLUTION" 26, ECF No. 31-1.)  GRTC's limitation on the use of this phrase is of no moment when considering the instant motions.

[9] GRTC initially contended that the preservation of collective bargaining rights to retain eligibility for federal transportation subsidies was "not the only purpose" for which the City of Richmond established a public stock structure.  (Strugar Decl., Ex. C, GRTC's Answers to Plaintiff's Second Set of Req. For Admissions. Resp. No. 17).  But GRTC never presented any explanation or proof on the record about why the City of Richmond chose to operate GRTC as a stock corporation rather than a public agency.  (*Id.*)  GRTC later suggests that the rationale for creating GRTC in its initial and current structure is "for the most part irrelevant."  (GRTC Resp. White Coat Mot. Summ. J. 3, ECF No. 34.)  This Court agrees with White Coat, however, that such evidence is partly relevant to evaluating whether GRTC is a public actor.

lease, or otherwise provide for the operation of a public transportation system . . . both within and outside the City of Richmond'" (the "1973 Charter Amendment").  (White Coat Req. Judicial Notice Ex. A "Acts and Joint Resolutions of the General Assembly of the Commonwealth of Virginia, Session 1973, Chapter 348, sec. 2," ECF No. 28.)  In April 1973, in accordance with the 1973 Charter Amendment, the City of Richmond created GRTC through the State Corporation Commission under Virginia's Stock Corporation Act.[10]  (Mem. Supp. GRTC Mot. Summ. J., Ex. B, "GRTC Articles of Incorporation," 23–24); (Adams Dep. 37.)  Following incorporation, the Richmond City Manager negotiated the sale of VTC's physical assets to GRTC, (Hurd, *Public Transportation* 24), and the Richmond City Council "appropriated $2,134,000 in bond funds as a grant to [GRTC] for the purpose of enabling it to meet the local share of the capital costs of acquiring and improving the transit system," (*id*. 25.)

### b.   The City of Richmond and Chesterfield County Own GRTC's Common Stock and Control Key Aspects of GRTC Operations

The City of Richmond originally owned all of GRTC's stock.  (Hurd, *Public Transportation* 24.)  Currently, ten shares of GRTC stock exist, with the City of Richmond and Chesterfield County each owning five shares.  (Adams Dep. 14–15.)  No entity other than the City of Richmond and Chesterfield County has at any time owned GRTC's stock.  (*Id*.)

A six-member Board of Directors ("the Board") operates GRTC today.[11]  (Adams Dep. 15.)  While Richmond initially appointed all board members, now the Richmond City Council appoints three members of the Board and the Chesterfield County Board of Supervisors appoints the other three.  (Hurd, *Public Transportation* 24); (Adams Dep. 17–18.)  Members of the GRTC

---

[10] The Virginia Stock Corporation Act is presently codified in Virginia Code Title 13.1, Chapter 9.  *See* Va. Code § 13.1-601.

[11] The inaugural Board consisted of nine members at the time of GRTC's founding.  (*See* Hurd, *Public Transportation* 24–25.)

Board serve a one-year term and can be removed by the local government entity that appointed

them.  (Adams Dep. 21.)  Nothing in the Record provided to the Court suggests that limits exist

on who can be appointed or on how long renewal of terms may continue.

GRTC's buses utilize "public use" license plates, and GRTC remains "subject to

[Virginia's Freedom of Information Act] because it is a 'public body' under Virginia Code § 2.2-

3701."  (GRTC's Responses and Objections to Plaintiff's First Set of Interrogatories, Resp. No.

14); (Adams Dep. 37.)  The Richmond City Attorney's office provides legal services to GRTC.

(Mem. Supp. White Coat Mot. Summ. J. 5, ECF No. 29); *see* Richmond City Code § 2-112(2)

("[t]he City Attorney shall provide such legal services as may be necessary and appropriate as

requested by the following entities . . . [including] [t]he Greater Richmond Transit Company,

including representation for its officers and employees with respect to certain claims for

damages").

As with its private predecessor VTC, the City of Richmond must authorize any fare

increases that GRTC wishes to institute within the city limits, and the City of Richmond's

mayor's office must be consulted regarding any proposed changes to any of GRTC's routes

within the City.  (Adams Dep. 17); (*see* Hurd, *Public Transportation* 23).  The Chesterfield

Board of Supervisors must approve any rate increase for routes in its county.  (Adams Dep. 20.)

Likewise, GRTC cannot decrease any rates without approval from the City of Richmond, the

Chesterfield Board of Supervisors, or any other governing body with GRTC routes in its

confines.  (*Id*. 17, 20.)

Given that it operates at a loss, the GRTC Board approves an annual budget—accounting

for projected fare revenue, advertising revenue, as well as federal and state contributions—and

then makes a specific request to the City of Richmond and Chesterfield County (for their

respective routes) asking for the necessary funds to cover the shortfall in the budget.  (Adams Dep. 29–30.)  Between 2010 and 2017, the City of Richmond provided eleven to fourteen million dollars to GRTC per fiscal year.  (Mem Supp. GRTC Mot. Summ. J., Ex. E, "GRTC Operating Budget," ECF No. 31-5); (Adams Dep. 29–30.)  The City of Richmond typically provides between 23%–30% of GRTC's annual revenue, constituting the largest share of government funding.  (GRTC Operating Budget); (Adams Dep. 28.)  Federal transportation subsidies account for anywhere between 10%–19% of GRTC's annual revenue, (GRTC Operating Budget); (Adams Dep. 27), while the Commonwealth of Virginia provides another 17.5%–23% of GRTC's annual revenue.  (GRTC Operating Budget); (Adams Dep. 30–31.) Advertising accounts for roughly one percent of GRTC annual revenue.  (Adams Dep. 24.)

### 2. GRTC's Advertising Policy Prohibits All Political Advertising

On September 13, 1973, GRTC's Board of Directors instituted a ban on all political advertisements.  (Mem. Supp. GRTC Mot. Summ. J., Ex. A, Sept. 27, "1973 GRTC Board Minutes," 4.)  The minutes report only that the question of banning political advertisements was raised and "discussed."  (*Id*.)  The minutes do not report the nature of the discussion, or why the question was raised.  A board member "moved that no political advertising should be allowed," another member seconded the motion, and the provision against political advertising was "adopted by voice vote." (*Id*.)  Nothing on the record suggests that the 1973 Board or GRTC passed or adopted any specific or written policy.  (Strugar Decl., Ex. J., "Deposition of Carrie Rose Pace" 38–39, ECF No. 26-2.)  Similarly, the May 18, 1987 Board Minutes state only that "Mr. Bobb moved that we retain our present policy of not allowing political advertising on buses."  (Mem. Supp. GRTC Mot. Summ. J., Ex. A, "May 18, 1987 Board Minutes," 14.) Again, the Board approved that motion "by voice vote."  (*Id*.)  The May 18, 1987 Board Minutes

say nothing else about the advertising motion, nor did GRTC offer any elaboration on this record.  (Pace Dep. 39.)

In 2013, the GRTC Board adopted its first written advertising policy.  The May 21, 2013 GRTC Board Minutes report that "GRTC has not had a policy for advertising on the buses. GRTC has had practices but no policy in place."  (Mem. Supp. GRTC Mot. Summ. J., Ex. A, "May 21, 2013 Board Minutes," 48.)  The GRTC Board then passed a written advertising policy. (Strugar Decl., Ex. I, "2013 Advertising Policy"); (Mem. Supp. GRTC Mot. Summ. J, Ex. A, "2013 Advertising Policy," 50–51.)

On April 16, 2018, the GRTC Board of Directors approved the most recent Advertising Policy, which changed the 2013 document only slightly to add a prohibition against content that would violate exclusive sponsorship rights.  (Mem. Supp. GRTC Mot. Summ. J., Ex. A, "April 16, 2018 GRTC Board Minutes," 57); (Strugar Decl., Ex. H, "2018 GRTC Advertising Policy," 1.) ("2018 Advertising Policy").  The prohibition on political advertisements remained the same in both documents:  GRTC prohibits "All political ads."[12]  (*Id.*)  GRTC did not issue any written policies between the 2013 and 2018 documents.  (Pace Dep. 11.)

Thus, the 2013 Advertising Policy was operative during the events in this case.  (*Id.*)  The policies include an identical preamble which provides:

> GRTC Transit System believes that advertising on bus vehicles is best performed when guided by a standard set of established criteria.  GRTC intends for this Advertising Policy to articulate those criteria by a viewpoint neutral advertising standard to be consistently applied and objectively enforced.  Enactment of this

[12] To be sure, the changes to the GRTC Advertising Policy in 2018 did not moot the claims White Coat raises in its 2017 Complaint because GRTC did not alter its ban on political advertising.  Moreover, past violations of constitutional rights are not necessarily mooted when an ordinance or policy changes during litigation.  *See, e.g.*, *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 n.4 (4th Cir. 2007) (holding that a plaintiff's challenge to a later-amended ordinance was not moot, because the plaintiff sought nominal and compensatory damages).

Policy represents GRTC's declared intent not allow any of its transit vehicles or property to become a public forum for dissemination, debate, or discussion of public issues.

(2013 Adver. Policy 1.)

GRTC states that any advertising is subject to approval by GRTC or its designated representatives, and prohibits "[a]ll political ads," and fourteen other categories of advertisements, including those which are obscene, promote illegal activity, convey religious or anti-religious messaging, or convey derogatory or defamatory messages. (2018 Advertising Policy.) GRTC's Advertising Policy also prohibits any advertisement that "[c]ontains internet address(es) and/or telephone number(s) that direct(s) viewers to materials, images or information that would violate this advertising policy if they were contained in advertising displayed or posted on GRTC Transit System vehicles." (2013 Adver. Policy 1.)

The policy also describes the overarching manner in which proposed advertisements would be reviewed:

The Advertising Contractor shall review each advertisement submitted for display on GRTC vehicles to determine whether the advertisement falls within, or may fall within one or more of the [15] categories set forth above. If the advertising Contractor determines that an advertisement falls within, or may fall within, one or more of the categories set forth above, then the Advertising Contractor will submit the advertisement, along with the name of the advertiser, size and number of the advertisements, and the dates and locations of display to the GRTC Marketing department for review of the advertisement by GRTC.

Upon determination of whether or not the advertisement falls into one of the categories listed in this policy, the GRTC Marketing department will advise the Advertising Contractor of the decision. GRTC reserves the right to reject or remove any advertising when it deems not to be in compliance with these guidelines.

(2013 Adver. Policy 1-2.) While describing the skeletal procedure GRTC uses to review a proposed advertisement, the 2013 Advertising Policy says nothing about how the substantive decision to allow or disallow a specific advertisement transpires. No written guidance defines

*how* a determination of whether or not an advertisement falls into one of the" categories

prohibited by the policy.  During this litigation, however, the Parties explored the decision-

making process by GRTC in depth.

### 3. The GRTC Process for Accepting or Rejecting Advertisements

GRTC works with Media Transit, "a private company which is on contract with GRTC as

approved by our board of directors to manage both inside and outside bus advertising."  (Pace

Dep. 27.)  If Media Transit "determines that an advertisement falls within, or may fall within," a

category prohibited by the Advertising Policy, Media Transit then submits the advertisement to

GRTC "for review of the advertisement by GRTC."  (2013 Adver. Policy 1.)  The 2013

Advertising Policy does not describe or define how Media Transit would decide whether an ad

may or may not fall within a category prohibited by the Advertising Policy.

The GRTC Marketing Department reviews any advertisement sent by Media Transit, and,

"[u]pon determination of whether or not the advertisement falls into one of the categories"

prohibited by the Advertising Policy, the GRTC notifies Media Transit of the decision.  (2018

Adver. Policy 1-2); (*see also* Pace Dep. 32.)  GRTC Director of Communications Carrie Rose

Pace evaluates proposed advertisements received from Media Transit.  (Pace Dep. 16, 33.)  Pace

testified about the process she undertakes in making that decision, but the 2013 Advertising

policy is silent as to the process she uses.  The record contains no document describing the

process Pace uses, nor does such a document appear to exist.

In carrying out the Advertising Policy, Pace recounted  that she consults with, or has

consulted with, a number of other actors at GRTC about potential advertisements, including:  (1)

Sally Brazil of MediaTransit; (2) Tim Brazil of MediaTransit; (3) Sheryl Adams; (4) Jonathan

Owens of the GRTC Marketing Department; and, (5) Anthony T. Carter Jr., Director of Risk

Assessment at GRTC.  (Pace Dep. 40–41.)  Pace did not indicate in exactly what circumstances she would consult with other actors, but testified that she sometimes sought a "second opinion" (*id*. 107, 142, 147), to "make sure that [she] was applying the advertisement policy correctly" (*id*. 146).

### 4. During her Deposition, the GRTC Director of Communications Testified as to Advertisements that GRTC had Accepted as a Public Service Announcement or Rejected as Political under its Advertising Policy

As part of this litigation, White Coat deposed Pace, the GRTC Director of Communications, pursuant to Federal Rule of Civil Procedure 30(b)(6)[13] regarding the Advertisement Policy and advertisements that have appeared on GRTC buses during her tenure. (*See* Pace Dep.)  When asked how she categorizes an advertisement as political, Pace explained that the word "could indicate a political party, content that is deemed political, expressing a viewpoint and only that viewpoint."  (Pace Dep. 34.)  Pace elaborated that "anything that's not viewpoint neutral could be" deemed political under the Advertising Policy.  (*Id*.)  Pace defined a "political action group" as any group that "engage[s] in a specific targeted policy advocacy that would be related to their one side of the political issue," (*id*. 37), or any group "tr[ies]to get political action based on [an advertisement]," (*id*. 144).[14]  Pace explained that what GRTC deemed a permissible "public service announcement" advertisement was one "meant to provide

---

[13] Federal Rule of Civil Procedure 30(b)(6) allows a party to "name as the deponent a public or private corporation, a partnership, an association, a governmental agency . . . , [which] must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf."  Fed. R. Civ. P. 30(b)(6).

[14] As the Court will discuss later, GRTC's definition of the term "political" has changed several times over the course of the litigation.  For example, in its pleadings on the Motion to Dismiss, GRTC relied on the first definition of "political" in Webster's New Collegiate Dictionary but has apparently ceased relying on that definition on summary judgment.  (GRTC Mem. Supp. Mot. Dismiss 13, ECF No. 9.)  The record does not show that a party submitting an advertisement to GRTC has notice of these definitions.

public information that is intended for public good and use, without making you -- I think I will just leave it at that, for public good and use." (*Id*. 208:13–17.) The Advertising Policy does not mention "public service announcement," nor does any document describe a public service announcement or how GRTC categorizes something as a public service announcement rather than a political advertisement.

To enforce this restriction, Pace visits any external source, such as a website URL, to determine whether language or images displayed on that external source violate the policy. (Pace Dep. 85.) If an advertiser's website contains "vulgar language . . . graffiti . . . or language whose messages targets or bashes individuals," then Pace rejects that advertisement. (Mem. Supp. White Coat Mot. Summ. J. 6–7 (internal quotation marks omitted).) Even if the proposed advertisement does not include a website, Pace "will find the proposed advertiser's website if she is not familiar with the product to learn more about the proposed advertiser in making her determination as to whether the advertisement violates GRTC's policy." (*Id*. 7.) When visiting external cites to certify compliance with the prohibition on political advertisements in the Advertising Policy, Pace finds it "most useful . . . to go to the home page" and then "check the 'About us,' so that [she] can better understand whether or not the group is a political action group." (Pace Dep. 75.) The record lacks any indication that Pace's review process is memorialized as written guidelines, or in any other form.

During Pace's deposition, White Coat asked Pace about specific advertisements offered to GRTC and whether GRTC accepted or rejected those advertisements based on the terms of the Advertising Policy. (*See generally id.*) Those advertisements are recounted briefly here.

13

### a.   GRTC Approves an Advertisement for Gracie's Guardians

In her deposition, Pace confirmed that she approved an advertisement from Gracie's Guardians, which subsequently ran on GRTC transit vehicles.



(Strugar Suppl. Decl., Ex. Z "Gracie's Guardians Advertisement," ECF No. 35-1.)  Pace stated that Gracie's Guardians, to her recollection, "is a partnership with Richmond Animal League to provide low cost spay and neuter options for public health of these animals."  (Pace Dep. 190.)  Pace determined that the Gracie's Guardians advertisement did not violate the GRTC Advertising Policy because "[i]t falls as a public service announcement regarding to [sic] spaying and neutering."  (*Id.*)  Pace believed the statement "Don't stand for cruelty" on the advertisement was not political because it was "in the context of and [sic] spay and neutering, in the context of the ad as a public service announcement."  (*Id.*)

In contrast, Pace stated that GRTC's Advertising Policy required her to reject White Coat's advertisement because White Coat is an "animal cruelty related nonprofit" and thus a "political action group."  (*Id.* 36.)  Pace differentiated Gracie's Guardians because when she reviewed their website, she did not see "political action group information on there."  (*Id.* 191.)

### b.    Media Transit Approves an Advertisement for Chickpeas that GRTC later Rejects

In January 2016, the Physicians Committee for Responsible Medicine ran the following advertisement for chickpeas on GRTC transit vehicles.  (Strugar Decl., Ex. D "White Coat Notice of Rule 30(b)(6) Deposition to GRTC," 41.)



(Strugar Decl., Ex. L "Chickpea Advertisement.")  Media Transit, without notifying GRTC's Communications Department, approved the advertisement and began running it inside buses. (Pace Dep. 133.)  After a reporter asked GRTC to comment, Pace went to the website for the Physicians Committee for Responsible Medicine and determined that their "mission" qualified as a "political action [mission]."[15]  (*Id*. 134–35.)  Pace explained in her deposition that the advertisement's content "triggered the question" of whether the advertisement violated the [Advertising] Policy, but the "website and the naming of the political action group" led her to believe it was a political ad.  (*Id*. 135.)  Pace did not offer specific testimony as to how or why she deemed this entity a political action group.

---

[15] Pace could not recall if she visited the web browser referenced on the advertisement, or the homepage of the Physicians Committee for Responsible Medicine.  (Pace Dep. 134–35.)

### c.      GRTC Approves an Advertisement for the 2016 Vice Presidential Debate

In September 2016, GRTC ran an advertisement promoting the Vice Presidential Debate at Longwood College in Farmville, Virginia.  (White Coat Notice R. 30(b)(6) Dep. 41.)  Pace classified the advertisement as a permissible "public meeting notice."  (*Id*. 147.)  Pace decided that the advertisement did not violate the Policy, as it promoted a "public meeting for the benefit of public information that's neutral, meaning that all sides are invited to participate in a moderated public discussion . . . exactly like a public meeting notice that we would have advertised on our buses anyway."  (*Id*. 147–48.)  When asked what the significance of "all political parties" being invited to participate was, Pace responded:

> [t]hat goes back to the viewpoint neutral, making sure that it is viewpoint neutral, that you provide a forum that is not going to -- at least on our bus, not the forum itself, but on our bus, that isn't going to favor one political side or the other.

(*Id*. 151–52.)  Pace could not recall whether William Weld, the Vice-Presidential candidate from the Libertarian Party, was invited to participate in the Longwood debate when she approved the advertisement.  (*Id*. 152.)  When asked whether electing a Vice President "is a political issue," Pace responded, that in her view, it "is a political action that an individual can choose to take or not take, yes.  But, that is not what the advertisement was about."  (*Id*. 153.)

16

####      d.      GRTC Rejects White Coat's Advertisement About Animal Testing at
               the McGuire VA Medical Center

In March 2017, as part of a campaign against McGuire VA Medical Center in

Richmond, Virginia conducting experiments using dogs, White Coat sought to run the

following advertisement with GRTC:



(White Coat Notice R. 30(b)(6) Dep. 41); (Strugar Decl., Ex. O "White Coat Advertisement.")

GRTC rejected White Coat's advertisement.  (Pace Dep. 101–04.)  Pace testified about her initial

review of the proposed advertisement, stating that she "was not familiar with the content of"

White Coat's "ad at all."  (*Id*. 101.)  She proceeded to the website for McGuire Veterans Center

to "try to understand what this [ad was] even referencing" and "Googled White Coat Wasted

[sic] Project to find their website."  (*Id*. 101–02.)  Because White Coat appeared to be an "animal

cruelty related nonprofit," Pace considered it "a political action group" and rejected White Coat's

proposed advertisement.  (*Id*. 102, 104.)  Pace related that she did not "recall" having concerns

with rider safety in relation to White Coat's advertisement.  (*Id*. 109.)

After GRTC rejected White Coat's advertisement, Justin Goodman, the Vice President of

Advocacy and Public Policy at White Coat, emailed Pace seeking explanation regarding the

decision to reject White Coat's advertisement.  (Goodman Decl. ¶ 8, ECF No. 27.)  Goodman

stated that White Coat was a "bipartisan nonprofit pursuant to section 501(c)(3) of the Internal

Revenue Code" and sought "clarification on how GRTC interpreted 'political ad.'"  (*Id*.)

Goodman "ask[ed] if there was any aspect of the advertisement that [White Coat] could change

to comply with GRTC's [Advertising] Policy."  (*Id.*)  Pace sent Goodman a copy of the

Advertising Policy, (GRTC Resp. White Coat Mot. Summ. J. 8), but did not clarify at that time

how she or GRTC interpreted the word "political," (Goodman Decl. ¶ 9).  Pace suggested that if

White Coat "partnered with a Richmond Animal Care and Control to run the ad, GRTC might

run it as a public service advertisement."  (*Id.*)

###### e.     GRTC Approves an Advertisement for the Virginia Commonwealth University's Institute for Contemporary Art

Roughly four months after White Coat initiated the instant lawsuit, Virginia

Commonwealth University ("VCU"), located in Richmond, Virginia, ran the following

advertisement (the "VCU Advertisement") promoting their Institute of Contemporary Art.



(Strugar Decl., Ex. N "the VCU Advertisement.")  GRTC's deliberations over the VCU

advertisement are documented in emails, which White Coat submitted.  (Strugar Decl., Ex. M

"Emails Regarding the VCU Advertisement.")  On February 27, 2018, at 1:02 p.m., Sally Brazil

of Media Transit forwarded the VCU Advertisement to Carrie Pace, saying "Art for

approval/VCU."  (*Id.* 224.)  At 1:05 p.m., three minutes later, Pace forwarded the email to

Anthony Carter, GRTC's Director of Risk Management, stating "[p]lease see the attached ad

awaiting approval.  Normally, this ad would not trigger any concerns, but the top left copy does.

Please advise."  (*Id.* 223–24.)  At 1:21 p.m., sixteen minutes after Pace's email, Carter replied:

> I do not have any issue with this.  Free Speech and Free Expression is what VCU
> is advertising for their Institute of Contemporary Art.  I don't think they are trying

influence anyone or change anyone's mind about a specific social/political issue.
I would be concerned if this was a political/socially motivated add [sic] using or
referencing Freedom of Speech or Freedom of Expression to influence the public.
I look at this add [sic] as nothing more than an advertisement/awareness notice for
VCU's Institute of Contemporary Art.

(*Id.* 223.)  An hour later, Pace responded, thanking Carter and stating that "[t]he ad is approved."

(*Id.*)

When asked to comment on GRTC's approval of the VCU advertisement, Pace recalled

that she "wanted to make sure that [the advertisement] was not political" due to its seeming

endorsement of free speech and free expression.  (Pace Dep. 155.)  When asked whether she

concurred with Carter's conclusion, Pace stated that "I trusted his conclusion. . . . I'm not well

versed in contemporary art, so I wanted somebody else's opinion."  (*Id.* 156.)  She further stated

that if the advertisement were actually advocating for free speech or free expression, then it

would "not be viewpoint neutral advertising."  (*Id.* 156–57.)  No written document describes the

double-checking process Pace undertakes, or how she conducts it.

> **f.    The GRTC Director of Communications Considers Hypothetical
> Advertisements During Her Deposition**

In addition to the actual advertisements about which Pace testified, Pace considered

hypothetical advertisements during her deposition to explain how she would review them under

the terms of the Advertising Policy.[16]  (*See, e.g.*, *id.* 62, 82.)  She concluded that an

---

[16] GRTC, in its Response to White Coat's Motion for Summary Judgment, protests that
"[s]uch hypotheticals call for speculation and do little to aid the process . . . [because] Pace and
GRTC were not given a full opportunity to review them through the regular process."  (GRTC
Resp. White Coat Mot. Summ. J. 15.)  GRTC contends that such advertisements would likely not
be admissible at trial under Federal Rule of Evidence 403.  (*See id.*)
    Under Rule 403, a court may "exclude relevant evidence if its probative value is
substantially outweighed by a danger of one or more of the following:  unfair prejudice,
confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting
cumulative evidence."  Fed. R. Evid. 403.  GRTC does not specify on which grounds it objects to

advertisement for Election Day would constitute a public notice, even though it encouraged

others to vote, because "it's legally their right."  (*Id.* 160–61.)



(Strugar Decl., Ex. T "Support Our Troops").

---

White Coat's deposition questions.  Regardless, the Court finds the evidence admissible under Rule 403.

    The probative value of Pace's responses to the hypothetical advertisements is apparent. White Coat brings facial and as-applied First Amendment challenges.  GRTC's Advertising Policy, as will be discussed later, must be reasonable and viewpoint neutral to survive White Coat's viewpoint discrimination claim.  Similarly, GRTC's Advertising Policy must provide a person of ordinary intelligence a reasonably opportunity to understand what conduct it prohibits, and it may not encourage arbitrary and discriminatory enforcement to survive White Coat's vagueness claim.  Such hypotheticals aid the process by illustrating how GRTC classifies an advertisement, and why certain advertisements with similar content may be treated differently.

    Furthermore, the danger of unfair prejudice, confusing the issues, or misleading the jury do not outweigh the probative value of this evidence.  GRTC does not point to what part of its "regular process" was excluded when Pace was asked to compare hypothetical advertisements. (*See* GRTC Resp. White Coat Mot. Summ. J. 15.)  Indeed, the record indicates that GRTC's process for classifying advertisements often lasted only a few minutes.  (*See generally* Emails Regarding the VCU Advert.)  GRTC cannot claim unfair prejudice from the fact that opposing counsel discussed each advertisement for a short period of time.

    Moreover, because White Coat brings *facial* challenges to the Advertising Policy, the Court may consider these hypotheticals when resolving whether the Advertising Policy violates the Constitution *on its face*.  *Preston v. Leake*, 660 F.3d 726, 738 (4th Cir. 2011) ("in the First Amendment context, the fear of chilling expressive rights has led courts to entertain facial challenges based merely on hypothetical applications of the law to nonparties").  Although courts generally frown upon litigation by hypothetical, it is sometimes required in First Amendment cases that involve facial challenges to speech restrictions.  *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973); *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38–39 (1999).  In any event, the Court considers the spontaneous nature of these colloquies when assigning weight to the evidence.

When asked whether an advertisement that directed viewers to "Support Our Troops" would qualify as political, Pace observed that GRTC's classification of the advertisement would hinge on the identity of the speaker.  (*Id.* 191–93.)  Specifically, she stated:

> **[Pace]**: I would need to know who [the support our troops advertisement] is from.
>
> **Q**. Why?
>
> **[Pace]**. Because I would need to determine if they are a political action group and if it's a political statement.
>
> **Q**. Is there any situation in which "Support our troops" would not be a political statement?
>
> **[Pace]**. I believe in war, there were ads sponsored by the United States Government to this theme.
>
> **Q**. Sure.
>
> **[Pace]**. So, I believe in war, that's my understanding.
>
> **Q**. So, if the United States Government sought to run this ad, would it violate the prohibition on political advertising?
>
>  ….
>
> **[Pace]**. Okay. So, it would fall as a *PSA*, a *public service announcement*, if they are asking for the public in war time to contribute to the war effort. I'm thinking specifically World War II, World War I, these are where I have seen these examples from the government.
>
> . . .
>
> **Q**. What if it was just from the veterans organization?
>
> **[Pace]**: Political action group, if they are, then they would fall under a political ad.

(*Id.* 191–93 (emphasis added).)

Pace cited "the Virginia Department of Health . . . putting out a public service announcement about testing for HIV" as another example of a public service announcement.

(*Id*. 206.)  Pace relayed her conclusion that a "public service announcement is meant to provide public information that is intended for public good and use, without making you -- I think I will just leave it at that, for public good and use."  (*Id*. 208.)

Pace also compared a hypothetical advertisement from the United States Army and an advertisement from an unidentified group.  (*Id*. 161–62.)



(Strugar Decl., Ex. R "Go Army Advertisement"); (Strugar Decl., Ex. S "No Army Advertisement.")  While Pace concluded that she would accept the "Go Army" advertisement, she indicated that the "No Army" advertisement "seem[ed] to be political in nature, so I would need to find out more from the advertiser."  (Pace Dep. 162–63.)  Pace explained that she would determine whether the group submitting the advertisement was a "political action group" or, if an individual submitted the advertisement, a "political action individual."  (*Id*.)  When asked whether she would reject the advertisement if it came from a group who took positions opposing war, Pace stated that "I believe so, based on what you have provided."  (*Id*. 163.)

Pace also discussed proposed commercial advertisements.  When asked to consider an advertisement from Walmart, Pace traveled to the "About us" section of the Walmart.com website.  (*Id*. 79.)  At that time, Walmart's website read:

> At Walmart we are committed to using our size and scale for good, not just for
> our customers, or even our associates, suppliers, and their families, but also for

the people in our communities and around the world that we will never meet.  We are proud to say that the work we do makes a real difference on the real issues that matter to all of us and drives meaningful change in a way that no other company can.

(*Id*. 79–80.)  Pace stated that the global responsibility section was "vague" and that she "would want to understand more" before approving an advertisement.  (*Id*. 81–82.)

### B.      White Coat Alleges Two Causes of Action

In the Complaint, White Coat brings two causes of action based on GRTC's Advertising Policy and GRTC's refusal to run White Coat's advertisement concerning the treatment of test-animals at McGuire VA Medical Center.  In Count I (the "Viewpoint Discrimination Claim"), White Coat alleges that "GRTC's refusal to run [White Coat's] advertisement amounts to discrimination on the basis of content and/or viewpoint in violation of the First and Fourteenth Amendments."[17]  (Compl. ¶ 39.)  In Count II (the "Vagueness Claim"), White Coat challenges the Advertising Policy as unconstitutionally vague because the Policy "is not clearly defined such that a person of ordinary intelligence can readily determine whether an advertisement is allowable or prohibited."  (*Id.* ¶ 43.)

The original two claims also involve specific and limited grounds for relief.  As relief, White Coat asks the Court to make two declarations:  (1) "[d]eclare that GRTC's [Advertising] Policy prohibiting 'political ads' is *facially* unconstitutional under the First and Fourteenth Amendments;" and, (2) "[d]eclare that GRTC's interpretation and implementation of its [Advertising] Policy prohibiting 'political ads' is unconstitutional *as applied* under the First and

---

[17] White Coat also alleges that GRTC "failed to follow its own regulations, in violation of the '*Accardi* doctrine.'"  (Compl. ¶ 40.)  The *Accardi* doctrine requires "[a]n agency of the government to scrupulously observe rules, regulations, or procedures that it has established." *United States v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999) (citing *United States v. Heffner*, 420 F.3d 809, 811 (4th Cir. 1969)).  When it fails to do so, courts may strike down the agency's action.  *Id.*.  Because this Court will grant White Coat's Motion for Summary Judgment as to the as-applied claims, it need not reach the *Accardi* doctrine.

Fourteenth Amendments." (*Id.* 12.)  White Coat also seeks two types of injunctive relief:

(1) "ordering GRTC to accept and display [White Coat's] proposed advertisement on terms no

less favorable than those given to other advertisers;" and, (2) "enjoining GRTC . . . from

continuing to enforce GRTC's [Advertising] Policy prohibiting 'political ads.'" (*Id.*)  Finally,

White Coat seeks attorneys' fees and costs.  (*Id.* 13.)

## II.  Standard of Review:  Rule 56

Summary judgment under Rule 56 is appropriate only when the Court, viewing the

record as a whole and in the light most favorable to the nonmoving party, determines that there

exists no genuine issue of material fact, and that the moving party is entitled to judgment as a

matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Liberty Lobby*, 477

U.S. at 248–50.

"A fact is material if the existence or non-existence thereof could lead a [finder of fact] to

different resolutions of the case." *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 628 (E.D. Va.

2016) (citing *Liberty Lobby*, 477 U.S. at 248).  Once a party has properly filed evidence

supporting its motion for summary judgment, the nonmoving party may not rest upon mere

allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues

for trial.  *Celotex Corp.*, 477 U.S. at 322–24.  The parties must present these in the form of

exhibits and sworn affidavits.  Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most

favorable to the nonmoving party.  *Liberty Lobby*, 477 U.S. at 255.  Whether an inference is

reasonable must be considered in conjunction with competing inferences to the contrary.  *Sylvia*

*Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995).  Nonetheless, the nonmoving "party

is entitled 'to have the credibility of his [or her] evidence as forecast assumed.'" *Miller v.*

*Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (*en banc*) (quoting *Charbonnages de France v.*

*Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

In the end, the non-moving party must do more than present a scintilla of evidence in its

favor.

> Rather, the non-moving party must present sufficient evidence such that
> reasonable jurors could find by a preponderance of the evidence for the non-
> movant, for an apparent dispute is not genuine within contemplation of the
> summary judgment rule unless the non-movant's version is supported by
> sufficient evidence to permit a reasonable [finder of fact] to find the facts in his
> [or her] favor.

*Sylvia Dev. Corp.*, 48 F.3d at 818 (internal quotations, citations, and alterations omitted).  The

ultimate inquiry in examining a motion for summary judgment is whether there is "sufficient

evidence favoring the nonmoving party for a [finder of fact] to return a verdict for that party.  If

the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary

judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

Where the court is faced with cross-motions for summary judgment, as in the instant case, the

court must review each motion separately on its own merits.  *Rossignol v. Voorhaar*, 316 F.3d

516, 523 (4th Cir. 2003).

### III.  Legal Standard:  Section 1983 Claims

Section 1983 provides a private right of action for a violation of constitutional rights by

persons acting under the color of state law.  *See* 42 U.S.C. § 1983.  Section 1983 states, in

relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Section 1983 is not itself a source of substantive rights, but rather provides a vehicle

through which plaintiffs may challenge alleged deprivations of their constitutional rights. *See*

*generally Carey v. Piphus*, 435 U.S. 247, 253 (1978) (stating that § 1983 "was intended to

'[create] a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or

immunities secure[d]' to them by the Constitution." (quotation omitted)).  In broad terms, to state

a claim under § 1983, "a plaintiff must establish three elements . . . : (1) the deprivation of a right

secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state

law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997); *see also Brown v. Mitchell*,

308 F. Supp. 2d 682, 692 (E.D. Va. 2004) (citations omitted) ("[A] plaintiff must show that the

defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory

rights, and thereby caused the complained of injury.").

When a plaintiff brings a Section 1983 claim against a government entity such as a

municipality, liability attaches only if "an official policy or custom" caused the "unconstitutional

deprivation of the plaintiff's rights."  *Brown*, 308 F. Supp. 2d. at 692 (citing *Monell v. Dep't of

Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)).

> A policy or custom for which a municipality or government entity may be held
> liable can arise in four ways:  (1) through an express policy, such as a written
> ordinance or regulation; (2) through the decisions of a person with final
> policymaking authority; (3) through an omission, such as a failure to properly
> train officers, that "manifest[s] deliberate indifference to the rights of citizens";
> or[,] (4) through a practice that is so "persistent and widespread" as to constitute a
> "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217

(4th Cir. 1999)).

## IV.  Analysis:  State Action For § 1983 Purposes

White Coat contends that the GRTC Advertising Policy violates the First Amendment

because it impermissibly restricts "political" advertisements.  As a threshold issue, the Court

must determine whether GRTC represents a state actor before deciding whether GRTC's Advertising Policy violates the First Amendment.  The Court finds that GRTC—by virtue of its statutory origin, public function, and government ownership—constitutes a state actor for Section 1983 purposes.  The Court rests this finding on two grounds.  First, under the "entwinement" approach to state action, GRTC constitutes a government actor because the City of Richmond and Chesterfield County are "entwined in . . . [GRTC's] management or control." *Evans v. Newton*, 382 U.S. 296, 301 (1966).  Second, under the United States Supreme Court's decision in *Lebron v. National Railroad Passenger Corporation*, GRTC is "by its very nature" what the Constitution regards to be government.  513 U.S. 374, 392 (1995).

## A.   Because the Governments of Richmond and Chesterfield County are Entwined in the Management and Control of GRTC, GRTC is a State Actor

GRTC constitutes a government actor because the City of Richmond and Chesterfield County are "entwined in . . . [its] management or control." *Evans*, 382 U.S. at 301.  Because of this relationship, the actions of GRTC may fairly be treated as those of the state itself for § 1983 purposes.

### 1.   Legal Standard:  Entwinement and State Action Under § 1983

Section 1983 provides a private right of action for a violation of constitutional rights by persons or entities acting under the color of state law.  *See* 42 U.S.C. § 1983.  "The statutory color-of-law prerequisite is synonymous with the more familiar state-action requirement–and the analysis for each is identical."  *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)).

The United States Court of Appeals for the Fourth Circuit has "observed that merely private conduct, no matter how discriminatory or wrongful[,] fails to qualify as state action."  *Id.* at 181 (citing *Mentavlos v. Anderson,* 249 F.3d 301, 301 (4th Cir. 2001)) (internal quotation

27

marks omitted).  "This is so, in part, to preserve[ ] an area of individual freedom by limiting the reach of federal law and avoid[ing] impos[ition] [up]on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Id.* (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991)) (internal quotation marks omitted).  Thus, "[p]rivate activity will generally not be deemed 'state action' unless the state has so dominated such activity as to convert it to state action." *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 (4th Cir. 2009) (quoting *DeBauche v. Trani*, 191 F.3d 499, 507 (4th Cir. 1999)).

On the other hand, "'the deed of an ostensibly private organization or individual' may at times demand to be treated 'as if a State has caused it to be performed.'" *Mentavlos*, 249 F.3d at 310 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)).  In particular, "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Id.* (citations and internal quotation marks omitted).  In the end, "no specific formula" guides the Court's analysis in determining the existence of state action: "'What is fairly attributable [to the state] is a matter of normative judgment, and the criteria lack rigid simplicity.'" *Philips*, 572 F.3d at 182 (alteration in original) (quoting *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006)).

Relevant here, a nominally private entity may become a state actor when government "is entwined in . . . [its] management or control." *Evan*, 382 U.S. at 301.  For instance, in *Brentwood*, the Supreme Court determined that "a statewide association incorporated to regulate interscholastic athletic competition" was a state actor where public schools comprised 84% of the association's membership, state board members served on the association's board, and the association's employees were treated as state employees for retirement purposes.  531 U.S. at

288, 298, 300.  Justice Souter, writing for the majority, stated that "[t]he nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it."  *Id.* at 298.

### 2. Richmond and Chesterfield County Are Entwined in the Management and Control of GRTC

GRTC fits the "entwinement" criteria for at least eight reasons.  First, the City of Richmond and Chesterfield County own GRTC's common shares, and GRTC has always been one-hundred percent government owned.  (Adams. Dep. 14–15.)  Second, the City of Richmond and Chesterfield County appoint the six-member Board of Directors, who serve one-year terms and may be removed at will by the elected government body that appointed them.  (*Id*. 16–19, 21.)  Third, GRTC's buses utilize "public use" license plates.  (Adams Dep. 37.)  Fourth, GRTC remains subject to Virginia's Freedom of Information Act.  (GRTC's Responses and Objections to Plaintiff's First Set of Interrogatories, Resp. No. 14.)  Fifth, the Richmond City Attorney's Office provides legal services to GRTC, including in the instant lawsuit.  *See* Richmond City Code § 2-112(2).  Sixth, the City of Richmond must authorize any fare increases that GRTC wishes to institute.  (Adams Dep. 17.)  Seventh, the GRTC Board approves an annual budget, taking into account projected fare revenue as well as federal and state contributions, and then makes a specific request to the City of Richmond for the remainder.  (GRTC Operating Budget); (Adams Dep. 27–31.)  Eighth, and finally, the Virginia General Assembly, through the 1973 Charter Amendment, authorized the City of Richmond to create GRTC.  (Acts and Joint Resolutions of the General Assembly of the Commonwealth of Virginia, Session 1973, Chapter 348, sec. 2.)

Taken together, these facts show that the "nominally private character of [GRTC] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." *Brentwood*, 531 U.S. at 298. In contrast to *Brentwood*, where public schools comprised only 84% of an organization's governing body, the entirety of GRTC's Board of Directors is appointed by government bodies, and those same government bodies own GRTC's ten shares of stock. Because of this "close nexus" between the local governing entities and GRTC, which filters down into numerous aspects of GRTC's budget, the composition of its vehicles, its legal status, and operating procedures, GRTC's actions "may be fairly treated as that of the State itself." *Id*. at 295 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

In the alternative, the Court finds that GRTC qualifies as a government actor under another, more stringent test for state action. In a natural extension of the "entwinement" cases, the Supreme Court has determined that "[g]overnment-created and -controlled corporations" may be part of the government itself for First Amendment purposes. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995). The *Lebron* decision, analyzing the formation and structure of Amtrak to determine whether the transit company amounted to a state actor, proves instructive here.

**B.    GRTC Qualifies as a State Actor Under the Supreme Court's Decision in _Lebron v. National Railroad Passenger Corporation_**

In *Lebron*, the Supreme Court determined that the National Railroad Passenger Corporation, more commonly known as "Amtrak," was "by its very nature, what the Constitution regards as the Government" and thus a state actor. 513 U.S. at 392. Relying on many of the same factors in the above entwinement analysis, the Supreme Court set forth a three-part test for determining when a nominally private entity became "part of the Government" for First Amendment purposes. *Id*. at 400. The Court will first briefly recount the *Lebron* decision before

30

finding that GRTC, like Amtrak, meets all three prongs of that test and should be viewed as "part of the Government" for purposes of this case. *Id.*

      1.      ***Lebron* Identifies Three Prongs to Determine When Entwinement Grows to Such Proportions that the Entity becomes "By its Very Nature, what the Constitution Regards as the Government."**

In *Lebron*, the Supreme Court concluded that Amtrak—"established and organized under federal law for the very purpose of pursuing federal governmental objectives under the direction and control of federal governmental appointees"—was, by virtue of its nature, what the Constitution regarded to be government. 513 U.S. at 398. In facts similar to those before the Court, the plaintiff in *Lebron* sought to run an advertisement critiquing certain political causes, but Amtrak rejected the advertisement. *Id.* at 377. The plaintiff contended that Amtrak's rejection of his advertisement constituted state action. *Id.* at 379–80.

Observing that "it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens," the *Lebron* Court looked to the "nature and history of Amtrak" to determine its governmental status. *Id.* at 383, 392. The *Lebron* Court first noted that the Rail Passenger Service Act of 1970 (the "RPSA") authorized the creation of Amtrak "to avert the threatened extinction of passenger trains" in the United States. *Id.* at 383–84. The RPSA, in addition to authorizing Amtrak's incorporation, "set forth its structure and powers" and "outline[d] procedures under which Amtrak will relieve private railroads of their passenger-service obligations." *Id.* at 384.

Next, the *Lebron* Court discussed how Amtrak was subsequently incorporated under the District of Columbia Business Corporation Act.[18] At the time, Amtrak's Board of Directors

---

[18] The District of Columbia Business Corporation statutes are presently codified in D.C. Code Title 29, Chapter 3. *See* D.C. Code § 29-301.01.

("Amtrak's Board") had nine members.  Six Directors, (including the current Secretary of

Transportation), were appointed by the President; two Directors, (by virtue of the Federal

Government's ownership of Amtrak's preferred stock), were appointed by the Secretary of

Transportation; and the final Director, Amtrak's President, was selected by the majority of

Amtrak's Board.  *See id.* at 385.  The Directors were not "removable by the President for cause,

and [were] not impeachable by Congress."[19]  *Id.* at 398.

Considering Amtrak's history, structure, and the common law, the *Lebron* Court

determined that Amtrak was subject to constitutional constraints.  The Federal Government was

not merely "entwined" with Amtrak's governance:  Amtrak was "by its very nature" what the

Constitution regarded to be government.  *Id.* at 392.  *Lebron* therefore established that a

corporation, like GRTC, is "part of the Government" for constitutional purposes when: "[(1)] the

Government creates [the] corporation by special law, [(2)] for the furtherance of governmental

---

[19] In *Lebron*, the Supreme Court emphasized both government control, and its longevity:

> Amtrak is not merely in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be); it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees.  It is in that respect no different from the so-called independent regulatory agencies such as the Federal Communications Commission or the Securities Exchange Commission, which are run by Presidential appointees with fixed terms.

*Id.* at 398.  The Executive Branch's authority to appoint Amtrak Directors meant that it exerted its control not just as a creditor or owner, but as a "policymaker."  *Id.* at 399.

The Supreme Court stressed that this conclusion was borne not only from history and law, but from common sense.  If government were able to avoid constitutional obligations by simply incorporating, a state would be able to resurrect "Plessy v. Ferguson . . . by the simple device of having the State of Louisiana operate segregated trains through a state-owned Amtrak." *Id.* at 397.  That Amtrak's federal charter stated that it "shall be operated and managed as a for profit corporation" did not compel a different result.  *Id.* at 385 (citing 45 U.S.C. § 541 (1988 & Supp. V)).

objectives, and [(3)] retains for itself permanent authority to appoint a majority of the directors of that corporation." *Id.* at 400*; see also Kerpen v. Metro. Washington Airports Auth.*, 907 F.3d 152, 158 (4th Cir. 2018), *cert. denied*, 140 S. Ct. 132 (2019) (discussing *Lebron* prongs); *Philips*, 572 F.3d at 185–86 (recognizing three *Lebron* prongs).

### 2.     The History and Ownership Structure of GRTC Satisfy the Three *Lebron* Prongs for Determining the Existence of State Action

The history and ownership structure of GRTC satisfy the three *Lebron* prongs, meaning GRTC's actions may be fairly treated as the actions of the government itself.[20]

### a.     The First *Lebron* Prong: Creation by Special Law

The Court finds the first *Lebron* prong—whether the government creates the corporation by special law—satisfied.  The Court observes that the 1973 Charter Amendment led to GRTC's creation.  Like the statute at issue in Amtrak, an enabling statute authorized the creation of GRTC.

Although GRTC contends that GRTC was not created by special statute or law, this argument fails for two reasons.[21]  First, the Virginia Generally Assembly created GRTC by a

---

[20] As in the entwinement analysis set forth above, eight facts unique to GRTC's ownership structure that support this conclusion:  (1) the City of Richmond and Chesterfield County own GRTC's common shares (and GRTC has always been one-hundred percent government owned); (2) the City of Richmond and Chesterfield County appoint the six-member Board of Directors, who serve one-year terms and may be removed at will; (3) GRTC's buses utilize "public use" license plates; (4) GRTC remains subject to Virginia's Freedom of Information Act; (5) the Richmond City Attorney's Office provides legal services to GRTC, including in the instant lawsuit; (6) the City of Richmond must authorize any fare increases that GRTC wishes to institute; (7) the GRTC Board approves an annual budget, taking into account projected fare revenue as well as federal and state contributions, and then makes a specific request to the City of Richmond for the remainder; and, (8) the 1973 Charter Amendment authorized the creation of GRTC.

[21] Because *Lebron* focused only on whether Amtrak constituted a state actor, it did not address whether the plaintiff brought facial or as-applied First Amendment challenges.  *See* 513 U.S. at 376 ("In this case we consider whether actions of the National Railroad Passenger

"special law" in a substantially similar manner as Congress established Amtrak. Second, a

"special law" requirement as narrowly as GRTC seeks would undermine the reasoning of

*Lebron*, contravene binding Supreme Court precedent in *Brentwood* and *Evans*, and muddy state

action jurisprudence.[22]

Here, the 1973 Charter Amendment authorizing the creation of GRTC qualifies as a

special law. Virginia government authorized the City of Richmond "to acquire, operate, lease, or

otherwise provide for the operation of a public transportation system . . . both within and outside

the City of Richmond." (*See* Act of Joint Resolutions of the General Assembly of the

Commonwealth of Virginia, Session 1973, Chapter 348, sec. 2.) The City of Richmond thus

acquired the ability to operate a *particular* transit system from a specific *act* of the legislature

having no applicability to the members of the general public, other corporations, or other transit

---

Corporation, commonly known as Amtrak, are subject to the constraints of the Constitution."). The *Lebron* Court made no findings as to whether Amtrak's refusal to air plaintiff's advertisement violated the First Amendment. Rather, the *Lebron* court merely held that "where . . . the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 399.

GRTC, relying on *Lehman v. City of Shaker Heights*, contends that prohibitions on political advertising on public transit systems are *de facto* reasonable. 418 U.S. 298 (1974). *Lehman*, a plurality opinion issued more than two decades before *Lebron*, assumed state action but did not address the analysis for determining when a transit system functions as a government actor for Section 1983 purposes. Instead, the *Lehman* Court summarily stated that "state action exists." *Lehman*, 418 U.S. at 303 ("Because state action exists, however, the policies and practices governing access to the transit system's advertising space must not be arbitrary, capricious, or invidious."). Here, the Court similarly finds that government action exists, but does so on a more expanded record.

[22] *Lebron* does not detail how Amtrak's authorizing statute was special or differed from a normal law. The term "special law" appears only once in the opinion, and the Supreme Court referred to a "special statute" in one other instance, stating that "Amtrak was created by a special statute, explicitly for the furtherance of federal governmental goals." 513 U.S. at 397, 400. The Supreme Court simply explained that the First Amendment applied to Amtrak because it was created by a special statute to advance a state interest and the President retained the power to appoint directors for the corporation. *Id.* at 399–400.

systems in the state.  Put another way, the General Assembly only delegated the City of

Richmond the authority to create a certain entity, not a general power.  The City of Richmond

then exercised that authority, delegated by a special law of the legislature, to incorporate GRTC

and acquire VTC's assets.

GRTC protests that the 1973 Charter Amendment merely delegated "broad transportation

authority" to the City of Richmond, which could have then chosen to operate a public or private

transit service. [23]  (GRTC Resp. White Coat Mot. Summ. J. 10.)  The fact that the

Commonwealth delegated broad transportation authority does not change the fact that GRTC's

creation was explicitly authorized by a "special law" of the legislature.  That the City of

Richmond possessed the authority to choose to operate the transit system through public or

nominally private means bears no relevance as to whether the law was "special."[24]

---

[23] The amount of detail in an authorizing statute, in and of itself, cannot be *determinative* of whether the actions of an entity can be fairly treated as those of the state.  Furthermore, the nature of the state-local government relationship may explain the generality of the General Assembly's delegation of power.  In *Lebron*, Congress delegated authority to a subordinate agency to create Amtrak.  Here, the General Assembly delegated authority to another elected body, the Richmond City Council.  While Congress might feel at ease proscribing more specific rules to guide an agency's discretion, the same dynamic does not hold true at the state and local levels.  The state might reasonably wish to give a political subdivision more power over an institution that will operate locally and give fewer specific instructions to allow the local citizens power over an institution that will affect their day-to-day life.  The difference in detail in the authorizing legislation, then, likely reflects less on the nature of GRTC as a government entity and more on the relationship between the state and local governments.  On a more fundamental level, the amount of detail included in the authorization does not alter the fact that GRTC, as a corporation, was formed by special law.

[24] If anything, the fact that the City of Richmond possessed the authority to operate GRTC as either a publicly held-stock corporation or an agency of the city government lends credence to the conclusion that GRTC is a government actor.  *See City of Richmond v. Confrere Club of Richmond, Va. Inc.*, 387 S.E.2d 471, 473 (Va. 1990) (explaining that Virginia's Dillon Rule "provides that municipal corporations possess and can exercise only those powers expressly granted by the General Assembly, those necessarily or fairly implied therefrom, and those that are essential and indispensable.").

GRTC's contention that GRTC was not created through the 1973 Charter Amendments and thus not "created" by special law is similarly unavailing.  The RPSA did not create Amtrak. Congress, through the RPSA, authorized the creation of Amtrak, which was subsequently incorporated by the Executive Branch under the District of Columbia Business Corporation Act. Similarly, the 1973 Charter Amendment did not create GRTC.  The Virginia General Assembly authorized the creation of GRTC, which was incorporated by the City of Richmond under Virginia's Stock Corporation Act.  In both cases, the legislature authorized the creation of the stock corporation while another government actor created the corporation through existing corporate formation statutes.  The method of GRTC's creation differs little, if at all, from that of Amtrak's.  The Court concludes that GRTC was authorized and created pursuant to a "special law" of the Virginia General Assembly.

### b.    The Second *Lebron* Prong: Furtherance of Governmental Objectives

The Court finds that the *second* Lebron prong—the furtherance of governmental objectives—also is met on the record before it.  The Supreme Court recognized in *Lebron* that the preservation of public transportation amounts to furtherance of a governmental objective. *Lebron*, 513 U.S. at 399.  The City of Richmond, a government body incorporated GRTC in the early 1970s, for the purpose of "preserv[ing] the city's transit services."  (Hurd, *Public Transportation* 23.)  The Court finds this second criterion met for determining the existence of state action.

### c.    The Third *Lebron* Prong: Government Retains Authority

Finally, the Court determines that the third *Lebron* prong—whether the government has retained for itself permanent authority to appoint a majority of the directors of that corporation— also is satisfied.  The City of Richmond, and later Chesterfield County, has retained "for itself

36

permanent authority to appoint a majority of the directors" of GRTC.  *Lebron*, 513 U.S. at 400.

Indeed, the City of Richmond and Chesterfield County's control over the GRTC Board surpasses

the Federal Government's control over Amtrak as described in *Lebron*.  The City of Richmond

and Chesterfield County each appoint three members of the six-member GRTC Board.  There

appear to be no limitations, statutory or otherwise, on who the governing bodies may appoint.

The local governing bodies enjoy complete discretion not only over appointments to the Board,

but also removals.  According to GRTC, board members, even though they are appointed to only

one-year terms, are removable at-will by the bodies that appointed them.

These facts present a stronger case of government control than those examined in *Lebron*.

In *Lebron*, certain statutes limited the President's discretion as to whom he or she could appoint

to the Amtrak Board by certain, objective criteria.  Amtrak's Board Members served longer

terms, and were not so easily removed.  Six Amtrak Board members served either two or four-

year terms, and they were not removable—for 'good cause' or otherwise—by the President.

Furthermore, the structure of Amtrak at least allowed *for the possibility* of a private stake in

Amtrak.  In its corporate history, Amtrak previously had private common stock shareholders

who possessed the power to appoint board members.  Here, no such private control exists.  Since

GRTC's incorporation nearly four decades ago, no non-governmental entity has ever owned one

of its ten shares.[25]

---

[25] The Court also notes that the City of Richmond and the Commonwealth of Virginia provide between 40-53% of GRTC's annual revenue, while the federal government provides an additional 10-19%.  The receipt of public funds does not, in and of itself, constitute sufficient state action to satisfy § 1983.  *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982) ("the school's receipt of public funds does not make the discharge decisions acts of the State.")  The receipt of public funds is, however, relevant in determining state action, and may reflect further control of the government over a nominally private corporation.  *See Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151–54 (2d Cir. 2004) (finding it "self-evident" that receipt of public funds by library association supported a claim of state action under § 1983).

GRTC argues that White Coat "will be unable to present any evidence that any governmental actor exercised or attempted to exercise any control over which advertisements to run." (GRTC Mem. Supp. Mot. Summ. J. 10–11.)  GRTC misinterprets *Lebron* to include a requirement that a government appointee or employee actually make the specific decision said to violate the Constitution.  The employees who rejected the proposed advertisement at issue in *Lebron* were Amtrak employees, not federal government workers.  Those Amtrak employees, however, carried out a policy that was set or approved (either explicitly or implicitly) by Amtrak's Board, which was almost entirely composed of government appointees.  Here too, GRTC's Board, appointed entirely by local governing bodies, adopted the initial ban on political advertising in 1973 and have continued that policy.  The ban has subsequently been carried out by employees who serve at the pleasure of the Board, which the City of Richmond and Chesterfield County appoints.[26]

---

[26] GRTC's argument that they cannot be deemed a state actor seems to echo Justice O'Connor's dissent in *Lebron*.  In dissent, Justice O'Connor contended that "[a]lthough a number of factors indicate the Government's pervasive influence in Amtrak's management and operation, none suggest that the Government had any effect on Amtrak's decision to turn down [the plaintiff's] proposal."  513 U.S. at 412.  But the *Lebron* majority concluded that there need *not* be a showing that the influence or decisions of governmental appointees filtered down into every conceivable decision for the government to exercise control as a "policymaker."  *Id*. at 399.  In this case, it suffices that the government exerted command over the policy and practice of GRTC through the control of its Board.

Common sense mandates this conclusion, especially on the facts of this case.  In 1973, GRTC's Board, consisting entirely of government appointees, adopted by voice vote the political advertising policy in question with little discussion of its contours.  Today, GRTC's Director of Communications, Pace, typically has responsibility "for evaluating [a] proposed advertisement" and "rejects the advertisement" if she finds that it violates the Advertising Policy.  (Mem. Supp. White Coat Mot. Summ. J. 6.)  It cannot fairly be said that the government does not act as a policy maker when it sets a policy and delegates authority to an ostensibly private employee to enforce that policy.  *See Horvath*, 362 F.3d at 147 ("[t]hat is, the State need not have coerced or even encouraged the events at issue in the plaintiff's complaint if 'the relevant facts show pervasive entwinement to the point of largely overlapping identity' between the State and the entity that the plaintiff contends is a state actor.") (quoting *Brentwood*, 531 U.S. at 303).

Because GRTC's nominal independence from the state "is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings," *Brentwood Acad.*, 531 U.S. at 289, the Court concludes that GRTC constitutes a government actor for § 1983 purposes. *Compare, supra*, Section IV(A)(2) (undergoing entwinement analysis) *with* Section IV(B)(2)(a), (c) (evaluating *Lebron* factors one and three).

As a government entity, GRTC may be liable if "an official policy or custom" caused the "unconstitutional deprivation of the plaintiff's rights." *Brown*, 308 F. Supp. 2d. at 692. White Coat alleges that an official GRTC policy, the Advertising Policy, caused the constitutional violation. As a result, the Court agrees that GRTC may be liable for constitutional violations through § 1983. The Court turns next to the merits of White Coat's facial and as-applied Viewpoint Discrimination and Vagueness Claims.

## V. Analysis: Viewpoint Discrimination and Vagueness Claims

White Coat contends that the Advertising Policy violates the First Amendment because it allows GRTC to engage in impermissible viewpoint discrimination and is unconstitutionally vague. Two counts stand before this Court: Viewpoint Discrimination and Vagueness Claims. As a threshold matter, the Court recognizes that White Coat brings as-applied and facial challenges under the First Amendment and that those claims determine the applicable burden of proof and corresponding remedies.

### A.    Facial and As-Applied First Amendment Challenges

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. The Fourteenth Amendment makes this prohibition applicable to the States. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 245 n.10 (4th Cir.

1999). The GRTC Advertising Policy restricts certain types of speech, including advertisements it deems political, which underlies this First Amendment action.

Two types of challenges to the validity of a statute on First Amendment grounds exist: facial and as-applied. *See generally Fisher v. King*, 232 F.3d 391, 396–99 (4th Cir. 2000) (discussing as-applied and facial First Amendment challenges). The Supreme Court has explained that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). But "[t]he distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id.*; *see also United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 477–78 (1995) (contrasting "a facial challenge" with "a narrower remedy" than an as-applied challenge). In other words, "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (quoting *Citizens United*, 558 U.S. at 331.)

White Coat brings both facial and as-applied First Amendment challenges to the Advertising Policy. The substantive law for resolving White Coat's Viewpoint Discrimination Claim and Vagueness Claim remain the same for either a facial or an as-applied challenge, but the burden of proof and remedy for each challenge differs.

### 1. Facial First Amendment Challenges

In a facial challenge, "a plaintiff may sustain its burden in one of two ways." *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013). First, a plaintiff

asserting a facial challenge "may demonstrate that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) (*en banc*) (internal quotation marks and alterations omitted).  Second, a plaintiff asserting a facial challenge may prevail if he or she "show[s] that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (internal quotation marks and alterations omitted).

Under either scenario, a court considering a facial challenge must assess the constitutionality of the challenged law "without regard to its impact on the plaintiff asserting the facial challenge."[27] *Educ. Media Co. at Va. Tech, Inc. v. Swecker*, 602 F.3d 583, 588 (4th Cir. 2010).  Accordingly, when assessing the constitutionality of a government restriction on speech, such as the Advertising Policy at issue here, courts may consider hypothetical situations if the challenger brings a facial attack on the restriction.  *Preston v. Leake*, 660 F.3d 726, 738 (4th Cir. 2011) (when addressing a facial First Amendment challenge, a court may consider hypothetical applications of the speech restriction as to nonparties).

---

[27] The Supreme Court of the United States has remarked that a "facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully" and will succeed only if a litigant can "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  As this Court has explained:

> Facial challenges are disfavored for several reasons.  Among them, a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.  Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.  Further, facial challenges raise the risk of premature interpretation of statutes on the basis of factually barebones records.

*Marcellus v. Va. State Bd. of Elections*, 168 F. Supp. 3d 865, 872–73 (E.D. Va. 2016) (internal citations, quotations, and alterations omitted), *aff'd*, 849 F.3d 169 (4th Cir. 2017).

When crafting a remedy for facial claims versus as-applied claims, the facial invalidation of a government restriction on speech presents a broader remedy (declaratory relief) than an as-applied invalidation (injunctive relief).  That is so because a facial claim contends that a particular government restriction on speech can *never* be validly enforced and would be unconstitutional in all, or virtually all, of its applications.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  In contrast, an as-applied challenge concedes that the statute may be constitutional in many of its applications but asserts that it is not so under the particular circumstances of the case.

Because a facial challenge addresses whether a restriction on speech is "unconstitutional in all of its applications," *id.* (quoting *Salerno*, 481 U.S. at 745), assessing the constitutionality of the restriction *as applied* to the plaintiff is a critical first step.  *Cf. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) (examining specific conduct at issue before reaching facial claim).  If that analysis shows that the plaintiff's own speech may lawfully be prohibited, then the government restriction on speech is not facially unconstitutional.

### 2.   As-Applied First Amendment Challenges

To be sure, facial challenges and as-applied challenges conceptually overlap.  *See Doe v. Reed*, 561 U.S. 186 (2010) (acknowledging that plaintiffs' claim "has characteristics of both" as-applied and facial challenge).  But, in contrast to a facial challenge, the Court must assess an as-applied challenge "based on a developed factual record and the application of a statute to a specific person."  *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (*en banc*).  "In an as-applied challenge . . . the [government actor] must justify the challenged regulation with regard to its impact on the plaintiffs."  *Educ. Media Co. at Va. Tech v. Insley*, 731 F.3d at 298.

In some cases, courts may find restrictions on speech facially constitutional but unconstitutional as applied to plaintiffs. *See, e.g.*, *Educ. Media Co. at Va. Tech, Inc. v. Swecker*, 602 F.3d 583, 591 (4th Cir. 2010) (upholding restriction on speech as facially constitutional); *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 302 (4th Cir. 2013) (on a second appeal, concluding that the same challenged regulation at issue in *Swecker* violated the First Amendment as applied to plaintiffs).[28]  With this framework in mind, the Court turns next to the merits of White Coat's Viewpoint Discrimination and Vagueness Claims.

## B.      Viewpoint Discrimination Claim

In Count 1, White Coat contends that the Advertising Policy allows GRTC to engage in viewpoint discrimination both facially and as applied to White Coat.  Before reaching that issue, the Court must decide the appropriate standard of review based on whether advertising space in GRTC vehicles constitutes a public forum, a designated public forum, or a nonpublic forum.

### 1.      Legal Standard: The Government's Power to Regulate Speech in Different Forums

Although the First Amendment protects many forms of speech, "the government need not permit all forms of speech on property that it owns and controls."  *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).  The Supreme Court of the United States long has recognized that states may regulate the "time, place, and manner of expression" without running afoul of the First Amendment, subject to certain requirements.  *See, e.g.*, *Perry*, 460 U.S. at 45.  The requirements vary depending on the forum.  *Id.*; *see also Krishna*, 505 U.S. at 678–79.  In a First Amendment analysis, "three types of government-controlled spaces [exist]:

---

[28] That decision aligns with the Supreme Court's long-standing instruction that "the appropriate exercise of judicial power requires that important constitutional issues not be decided unnecessarily where narrower grounds exist for according relief."  *Communist Party of Ind. v. Whitcomb*, 414 U.S. 441, 451 n.1 (1974) (Powell, J., concurring) (opting to rest concurring vote on narrow, rather than broad, constitutional issue).

traditional public forums, designated public forums, and nonpublic forums." *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018).

First, government may only sparingly regulate speech on government property "that has traditionally been available for public [use]," and such regulation "is subject to the highest scrutiny." *Krishna*, 505 U.S. at 678. The quintessential public forum includes "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). "Reasonable time, place, and manner restrictions are allowed [in public forums], but any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest, and restrictions based on viewpoint are prohibited." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (internal citations omitted).

Second, a government entity may create a designated public forum "if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Id.* (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)); *see also Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Schs.*, 457 F.3d 376, 383 (4th Cir. 2006). Such forums can include "university meeting facilities generally open for use by student groups, a school board meeting open to the public, and a municipal auditorium and city-leased theater designed for and dedicated to expressive activities." *Goulart v. Meadows*, 345 F.3d 239, 249 (4th Cir. 2003) (citations omitted).

In a designated public forum, regulations on speech are subject to two different levels of scrutiny. *Child Evangelism*, 457 F.3d at 383. Under the so-called "external" standard, which

places restrictions on the government's ability to designate the class for whose benefit the forum has been opened, the restriction need only be "'viewpoint neutral and reasonable in light of the objective purposes served by the forum.'" *Goulart*, 345 F.3d at 250 (internal citations and quotations omitted). This is true because "the government 'may be justified "in reserving [its] forum] for certain groups or for the discussion of certain topics."'" *Demmon v. Loudoun Cty. Pub. Schs.*, 342 F. Supp. 2d 474, 481 (E.D. Va. 2004) (quoting *Goulart*, 345 F.3d at 249)). However, the so-called "internal" standard, which applies where a government excludes a speaker who falls within the class to whom the forum is opened, is "subject to strict scrutiny." *Goulart*, 345 F.3d at 250 (internal citations and quotations omitted).

"There is some confusion over the terminology use[d] to describe this [second] category, as the Supreme Court and lower courts have also used the term 'limited public forum'" interchangeably to what is also called a designated public forum. *Goulart*, 345 F.3d at 249. The Supreme Court has recognized public school facilities after hours and a student activity fund of a public university as limited public forums. *Id.*; *Child Evangelism*, 457 F.3d at 382. The Fourth Circuit has clarified that in a limited public forum, "the government creates a channel for a specific or limited type of expression where one did not previously exist." *Child Evangelism*, 457 F.3d at 382 (noting that a designated public forum, in contrast, is one where "the government makes public property . . . generally accessible to all speakers."). The speech restriction imposed on a limited public forum is subject to just one level of scrutiny: "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." *Pleasant Grove City*, 555 U.S. at 470 (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001)).

This level of scrutiny also applies to what courts have identified as the third type of government-controlled space, the "nonpublic" forum. *Mansky*, 138 S. Ct. at 1885. The Fourth Circuit has acknowledged that "the similarity between the external standard for speech restrictions in a limited public forum and the standard for speech restrictions in a nonpublic forum 'in effect makes the limited public forum analytically indistinct from a nonpublic forum.'" *Goulart*, 345 F.3d at 249 n.23 (quoting *Warren v. Fairfax Cty.*, 196 F.3d 186, 194 n.8 (4th Cir. 1999) (*en banc*)). A nonpublic forum is "subject to the same two limitations [as a limited public forum]: the policy must be reasonable and viewpoint neutral." *Child Evangelism*, 457 F.3d at 383 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998)).

**2.      The Advertising Space on GRTC Buses Is a Nonpublic Forum Because the Government Has Decided to Close It to Certain Types of Speech**

The advertising space on GRTC's buses operate as a nonpublic forum. GRTC, as a state actor, "retains the choice of whether to designate its property as a forum for specified classes of speakers." *Ark. Educ*, 523 U.S. at 680. When the government, such as GRTC, determines to close a forum to certain types of speech, it becomes a nonpublic forum. *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 323 (D.C. Cir. 2018) ("Having plainly evinced its intent in 2015 to close [the government transit system's] advertising space to certain subjects, the Board of Directors converted that space into a non-public forum."). GRTC, by substantially limiting speech and preserving public transportation as the primary goal of the forum, has evinced an intent to create a nonpublic forum.

Nearly every court to consider this question has concluded that advertising space on public transit systems is a nonpublic forum. *See Lehman*, 418 U.S. at 304 (recognizing city buses lacked a traditional "First Amendment forum"); *see also Archdiocese of Wash.*, 897 F.3d

at 322–23 (concluding transit system advertising space constituted a non-public forum); *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 891 (6th Cir. 2012); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st. Cir. 2004); *Uptown Pawn & Jewelry, Inc. v. City of Hollywood*, 337 F.3d 1275, 1278–79 (11th Cir. 2003); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 977 (9th Cir. 1998). Even knowing these advertisements appear both inside and outside GRTC vehicles,[29] this Court similarly concludes that the advertising space found on GRTC vehicles constitutes a nonpublic forum.

In any event, even were this Court to find that outside advertising somehow could convert the nonpublic forum to a limited one, White Coat and GRTC properly recognize that designating GRTC vehicles as a limited-public forum or a nonpublic forum is a distinction without a difference: either way, the policy limiting speech "must be reasonable and viewpoint neutral." *Child Evangelism*, 457 F.3d at 383.

---

[29] The Supreme Court has recognized the importance of a "captive audience" with regard to interior advertising space when reviewing First Amendment claims in the public transit context. *See, e.g.*, *Lehman*, 418 U.S. at 302 (discussing how prior case law reasoned that "viewers of billboards and streetcar signs had no choice or volition to observe such advertising and had the message thrust upon them by all the arts and devices that skill can produce. . . . The radio can be turned off, but not so the billboard or street car placard. . . [t]he streetcar audience is a captive audience.") (internal quotations marks and citations omitted). *Lehman*, which predates the forum analysis, has been "retconned into that framework." *Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 440 n.3 (3d Cir. 2019) (Cowan, J. dissenting).

Many courts interpreting the 1974 *Lehman* decision have decided that the "captive audience" aspect of the decision does not necessarily limit its application to interior advertising. *See, e.g.* *Archdiocese of Wash.*, 897 F.3d at 324 ("The Supreme Court [has] concluded that a city does not 'by selling advertising space . . .turn[] its buses into free speech forums.'" (quoting *Lehman*, 418 U.S. at 305–06) (additional citations omitted)). And while Justice Douglass's concurrence in *Lehman* focused on the captive audience aspect of the interior advertisements, it appears that the *Lehman* court had before it both interior and exterior advertisements. *Lehman*, 418 U.S. at 321 n.12. (Brennan, J. dissenting) ("The record reveals that the Shaker Heights Rapid Transit System provides advertising space on the outside as well as the inside of its cars.") (citing record).

### C.    Legal Standard: Viewpoint Discrimination Claims in Nonpublic Forums

The Court pauses to acknowledge that even beyond the entwinement and forum analyses, First Amendment free speech jurisprudence does not bestow a linear formula or clear-cut system for parties to follow or courts to apply.  As is evident in the Court's analysis below, claims can raise overlapping concepts.  The lines among cases, standards of review, and forms of relief often blur.  *Goulart*, 345 F.3d at 252 n.23 ("We acknowledge that by looking to the purpose of the forum to determine whether two proposed uses are of a similar character, we are blurring the lines between the 'similar character' inquiry and the 'external standard' for evaluating speech restrictions in a limited public forum—both inquiries involve, roughly speaking, a determination of whether the distinction drawn is relevant to the purpose of the forum.").[30]

The Fourth Circuit has recognized that "some overlap in analysis [can be] unavoidable," but an overlap of standards does not necessarily provide a "sufficient reason for [courts] to reject [the overlapping] approach."  *Id.*  Certain free speech claims, including the ones raised here, can implicate intersecting yet competing Supreme Court precedent.  With these complications in mind, the Court focuses on the precise claims that White Coat brought in its Complaint: Viewpoint Discrimination and Vagueness.

### 1.    Viewpoint Neutrality

When the State creates a nonpublic forum, it need not allow persons to engage in every type of speech.  *Good News Club.*, 533 U.S. at 106.  The State's power to restrict speech in a

---

[30] Another intersecting concept can occur when a court evaluates free speech challenge as either content-based or content-neutral.  As one scholar has observed, "courts tasked with determining whether a given law is content-neutral or content-based have had to choose between two competing but incompatible lines of precedent.  The result has been the creation of what commentators have described as a confused, inconsistent, and highly malleable body of law." Genevieve Lakier, *Reed v. Town of Gilbert, Arizona, and the Rise of the Anticlassificatory First Amendment*, 2016 Sup. Ct. Rev. 233, 234.

nonpublic forum, however, is not unlimited. *Cornelius,* 473 U.S. at 806. In a nonpublic forum, ensuring viewpoint neutrality requires the government to do more than just "refrain from explicit viewpoint discrimination." *Child Evangelism*, 457 F.3d at 384. The government entity regulating the speech must "provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *Id.* (citing cases). And, in *Child Evangelism*, the Fourth Circuit noted that unbridled discretion to apply a restriction risks viewpoint discrimination because "the government [might succeed] in unconstitutionally suppressing particular protected speech by hiding the suppression from public scrutiny." *Child Evangelism*, 457 F.3d at 386. Accordingly, in a nonpublic forum, like that of GRTC, government regulation or censorship of speech must be *both* reasonable and viewpoint neutral. *Id.* at 383 (emphasis added).

Regarding viewpoint discrimination, a restriction on speech must not discriminate based on the viewpoint of the speaker. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "[T]he test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017). At base, viewpoint neutrality ensures "that minority views are treated with the same respect as are majority views." *Bd. of Regents of Univ. of Wi. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

## 2. **Reasonableness**

In a nonpublic forum, restrictions on speech need only be reasonable as "assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809. The reasonableness standard is more exacting than the rational basis inquiry, and the government bears the burden of proof on it. *NAACP v. City of Philadelphia*, 834 F.3d 435, 441 (3d Cir. 2016). Still, "it need not be the most reasonable or the only reasonable limitation."

*Cornelius,* 473 U.S. at 808.  To allow a court to grasp the purpose to which the government actor has devoted the forum, courts can rely on evidence from the record, and on commonsense. *NAACP*, 834 F.3d at 441; *see also Archdiocese of Wash.*, 897 F.3d at 340.  "In other words, consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in the light of the characteristic nature and function of the particular forum involved."  *Goulart*, 345 F.3d at 255 (internal quotation marks and citation omitted).

Under this framework, the Court must first evaluate whether the exclusion of White Coat's advertisement amounted to impermissible viewpoint discrimination.

### D.      The GRTC Advertising Policy As Applied to White Coat Does Not Satisfy Viewpoint Neutrality

The record suggests that Pace and other members of GRTC's Communications Department are doing their level best to enforce the Advertising Policy in an evenhanded and thoughtful manner.  Indeed, GRTC's Advertising Policy expressly aspires to articulate a "standard set of criteria" which allows review of advertisements using a "viewpoint neutral" standard that is "consistently applied" and "objectively enforced."  Nonetheless, the Court concludes that GRTC engaged in unconstitutional viewpoint discrimination *as-applied* to White Coat because GRTC rejected White Coat's advertisement on political grounds while accepting other political advertisements.

To prevail against White Coat's as-applied Viewpoint Discrimination Claim, GRTC must justify the challenged regulation with regard to its impact on White Coat.  *Educ. Media Co. at Va. Tech v. Insley*, 731 F.3d at 298.  GRTC contends that its intent "is to not allow any of its transit vehicles or property to become a public forum for dissemination, debate, or discussion of public issues."  (Mem. Supp. GRTC Mot. Summ. J. 21, Ex. H "Pace Deposition" 35:4–18, ECF

No. 31–8.)  GRTC allows public service announcements without identifying this within its

Advertising Policy or another document.[31]  GRTC avers that it has "consistently interpreted the

phrase 'public issues' to refer to political content that specifically expresses an identifiable

viewpoint."  (*Id.* (quoting Pace Dep. 35:13–18).)  GRTC claims that it rejected White Coat's

advertisement because it "was a political action group" that "advocate[s] specifically against

animal cruelty."  (*Id.* (quoting Pace Dep. 37:19–22).)

But when asked how the advertisement could be considered non-political, GRTC sent a

copy of the Policy to White Coat without offering an interpretation of "political." (Goodman

Decl. ¶ 8).  By email, Pace suggested (without identifying any other textual change) that a

government agency co-sponsor might allow the advertisement to be run as a public service

announcement.  (Goodman Decl. ¶ 9).  Nothing in this record gives notice to White Coat as to

how GRTC determines "what falls within, or may fall within" one of the prohibited categories

such as the ban on political advertising.  (2013 Adver. Policy 1-2.)

Finally, in its response, GRTC recognizes that it erroneously ran the Chickpea

Advertisement (albeit without reviewing it) but "it is not required to be perfect."  (GRTC Resp.

White Coat Mot. Summ. J. 14.)  GRTC also states that even if the advertisement for the Vice

Presidential debate violated the Advertising Policy, GRTC's restriction on speech "need only be

reasonable."  (*Id*. 14–15.)

---

[31] In her deposition, Pace, absent any GRTC written guidance, relayed her presumption that a "public service announcement is meant to provide public information that is intended for public good and use, without making you -- I think I will just leave it at that, for public good and use." (Pace Dep. 208:13–17.)  As discussed in regard to White Coat's as-applied Vagueness Claim, such unpredictable application of the policy means a person of ordinary intelligence could not reasonably understand what may be prohibited.

### 1.    The Record Shows GRTC Engaged in Impermissible Viewpoint Discrimination As Applied to White Coat

First, while the record contains the policy that bans "all political ads," it contains no written description of how GRTC implements that policy.  Nothing enunciates how GRTC determined what fell within any of the listed prohibitions.  Instead, two employees testified about their experience applying it.  As GRTC presents its process, unfortunately, even the best efforts of these employees cannot surmount the absence of identifiable standards to apply the Advertising Policy in a consistent way.  GRTC has no written standards about how the Policy should be applied or interpreted.[32]  In fact, the record before the Court shows a level of inconsistency that renders the policy unconstitutional.

Here, the record shows that GRTC cannot justify its restriction on political advertisements as applied to White Coat.  At least three advertisements reviewed by GRTC demonstrate why.  First, the record shows GRTC permitted Gracie's Guardians to advocate against animal cruelty in the context of a "public service announcement," but White Coat could not advocate against animal cruelty in regard to the treatment of *specific* animals at a *specific* location.  In so doing, GRTC found a view uncontroversial when it attacked a practice at a certain level of generality ("don't be cruel to animals") but the same message became contentious and "political" when it advocated for a specific application of that view ("don't be cruel to *these* animals").  This inconsistency reveals how GRTC engaged in impermissible viewpoint discrimination as applied to White Coat.

---

[32] GRTC never placed an existing guidance document on the record.  Nor does the record suggest that, as often happens, GRTC created guidance because White Coat filed this lawsuit. *See, e.g., Mansky*, 138 S. Ct. at 1884 (where county officials created "Election Day Policy" providing guidance for political apparel ban within a polling place "[i]n response to the lawsuit."); *Goulart*, 345 F.3d at 242 n.2 (where county modified its written policy after litigation was commenced in the case).

Second, GRTC accepted advertisements promoting the Vice Presidential Debate, despite

its overtly political nature, because it advertised "a public meeting for the benefit of public

information that's neutral, meaning that all sides are invited to participate in a moderated public

discussion." (Pace Dep. 147: 21–24.) Of course, GRTC's statement that the debate would not

"favor one political side or the other" reveals a substantive underlying judgment: that there are

only two sides, or political parties, to be heard. (*Id*. 151–52.) Therefore, GRTC accepted overtly

political material which conveyed, on some level, a value choice on political ideologies because

of GRTC's subjective determination that a majority viewpoint was not political.[33] (*Id*. 148.) The

Advertising Policy allowed GRTC, through Pace, the discretion to determine that an

advertisement pertaining to a "political action that an individual can choose to take" was not

political only because she thought "that [was] not what the advertisement was about." (*Id*.

153:22–24.) Pace's unbridled discretion in applying this restriction shows viewpoint

discrimination because "the government [might succeed] in unconstitutionally suppressing

particular protected speech by hiding the suppression from public scrutiny."[34] *Child Evangelism*,

457 F.3d at 386.

---

[33] To be sure, the law allows public entities to exclude candidates in some instances –
such as excluding a candidate from a televised debate based on his or her status as a candidate
with little support – but this record is bereft of any such deliberation. *See Ark. Educ.*, 523 U.S. at
677.

[34] Here, the Court confronts overlapping First Amendment doctrines. In its *as-applied
viewpoint discrimination analysis*, the Fourth Circuit disapproved of inappropriate "unbridled
discretion" to limit access to a forum without "sufficient criteria to prevent viewpoint
discrimination." *Child Evangelism*, 457 F.3d at 386. As will be noted later, this standard
unmistakably echoes the two-part test for reasonableness and arbitrary enforcement in a *facial
vagueness challenge*. *See Mansky*, 138 S. Ct. at 1888 (citing *Cornelius*, 473 U.S. at 808–09) (the
state "must be able to articulate some sensible basis for distinguishing what may come in and
what must stay out").

Third, the record also shows that in some circumstances GRTC's Director of Communications admitted that interpretation of the Policy varied based on her level of familiarity with the content of the advertisement.  For instance, VCU sought to run an advertisement promoting its contemporary art institute that seemed to advocate for "Free Speech" and "Free Expression."  Pace "was not well versed in contemporary art," so she relied on and adopted the perspective of her peer, Anthony Carter, who presumably had familiarity with modern art.  (Pace Dep. 156:7–19.)  If either Pace or Carter determined that the advertisement was actually advocating for free speech or free expression—as one reasonably could considering those terms appeared in large font in the advertisement—then it would "not be viewpoint neutral advertising" and would violate the Advertisement Policy.  (*Id.* 157:3–4.)  But because Carter did not "think [VCU was] trying [to] influence anyone or change anyone's mind about a specific social/political issue" with the advertisement—and Pace trusted his judgment— it was approved.  (Strugar Decl., Ex. M "Emails Regarding the VCU Advertisement.")  GRTC accepted the VCU Advertisement not because its content was firmly apolitical, but because a GRTC official believed that VCU was not "trying [to] influence anyone."  (*Id.*)

Still, the record does not explain how GRTC, acting through Pace, determined that VCU was not "trying to influence anyone" via their advertisement:  surely, an advertisement for an art museum touting the history of free expression might influence the political views of those who attend.  Even if GRTC could be confident in VCU's intentions, their definition of "political" changed while determining the propriety of the advertisement.  It appears that GRTC' test, at least when it came to VCU, was whether an advertiser was attempting "to influence anyone" with their message—not whether the advertisement expressed a "viewpoint" or supported one political party or another.  GRTC tends to view non-controversial statements of a political nature

as "public service announcements"[35] while more controversial statements, or even the same statement espoused by a more controversial speaker, are viewed as "political" in violation of the Advertising Policy. The *ad hoc* application of the Advertising Policy results in the inclusion of mainstream or uncontroversial views—as viewed by GRTC—while more controversial statements are excluded.

The record also shows that Pace's implementation of the Advertising Policy involved seeking to learn more about the sponsoring organization before accepting or rejecting an advertisement. Again, no written procedure required this. But even this admirable attempt to self-educate resulted in a subjective determination of both a "political ad" or a "political action group" led to inconsistent results. GRTC rejected the White Coat advertisement because Pace considered the organization an "animal cruelty related nonprofit," which was, in her opinion, "a political action group." (*Id.* 36:10–13.) However, GRTC allowed Gracie's Guardians—a Pitbull rights group fighting against animal cruelty—to run an advertisement specifically imploring the community to not "stand for cruelty" because Pace did not "see . . . political action group information on [their website]" and she considered their advocacy for "spaying and neutering" to be a public service announcement. (*Id.* 19:5–6.) The Advertising Policy, as applied,

---

[35] Pace's oral description of a "public service announcement [as something] meant to provide public information that is intended for public good and use, without making you -- I think I will just leave it at that, for public good and use," (Pace Dep. 208:13–17), only highlights the lack systematic application of the Policy to White Coat's advertisement. While certainly undertaken in good faith, as the Rule 30(b)(6) designated official for GRTC, Pace's seemingly off-the-cuff definition underscores the lack of criteria followed when rejecting White Coat's proposed advertisement.

discriminates not just on the perceived political nature of the advertisement, but on GRTC's perceived political nature of the speaker.[36]

### 2. *Lehman* Does Not Foreclose the As-Applied Viewpoint Discrimination Claim White Coat Raises Here

GRTC argues that the factually analogous *Lehman* resolves the issues that White Coat presents to this Court. Specifically, *Lehman* found constitutional a city's ban on political advertisements on their public transit system. 418 U.S. at 303–04. In *Lehman*, the Supreme Court noted the "uncontradicted testimony at the trial [indicated] that during the 26 years of public operation, the Shaker Heights system, pursuant to city council action, had not accepted or permitted *any political or public issue advertisement on its vehicles*." *Id.* at 300–01 (emphasis added). The Supreme Court found that the policy did not violate the constitution because no evidence showed arbitrary, capricious, or invidious enforcement. *Id.* at 304.

Although *Lehman* supports the notion that a city transit system's prohibition on political advertisements could survive facial First Amendment scrutiny, the Court must resolve the as-applied claim on the record before it. In contrast to *Lehman*, White Coat alleges discriminatory enforcement as to its own advertisement in comparison to other political advertisements GRTC has accepted. And, unlike in *Lehman*, White Coat shows that GRTC has accepted political advertisements that it considers public service announcements based on a rather haphazard interpretation of the Advertising Policy by one person whose viewpoint affects decisions. GRTC

---

[36] This last point is underscored by GRTC's response to White Coat's request to identify any aspect of the advertisement that White Coat could change to comply with the policy. GRTC suggested no change to content, forwarded a copy of the Policy outlining the procedure to review submissions without defining "political" and, without elaboration, suggested that a partnership with a government agency – a change in the speaker -- might transform the submission into a public service advertisement. (Goodman Decl. ¶ 9).

does not show that, like the transit system in *Lehman*, it has consistently applied its ban on political advertisements for the past twenty-six years.

Despite the Advertising Policy's invocation of the talismanic First Amendment standards regarding viewpoint neutrality, objective and consistently applied criteria, and a manifest intent not to allow its transit vehicles to become a public forum for debate, the Court must find that, as-applied to White Coat, GRTC's Advertising Policy resulted in unconstitutional viewpoint discrimination.  The Court will grant White Coat's Motion for Summary Judgment on the as-applied Viewpoint Discrimination Claim.[37]

The Court turns next to White Coat's facial Viewpoint Discrimination challenge to the Advertising Policy.

### E.      The Advertising Policy Does Not Permit Viewpoint Discrimination On its Face Because it Prohibits All Political Advertisements

White Coat also brings a facial Viewpoint Discrimination challenge to the Advertising Policy's prohibition on political advertisements.  Although the Supreme Court's recent *Mansky* decision makes this facial Viewpoint Discrimination claim a close call, the Court will grant GRTC's motion for summary judgment on this issue in light of *Lehman*.

#### 1.      *Lehman* Permits A Ban on Political Advertisements for Interior Advertising Space on City Buses

The reasonableness of the Government's restrictions in a nonpublic forum is "assessed in the light of the purpose of the forum and all the surrounding circumstances."  *Cornelius,* 473 U.S. at 809.  Still, "it need not be the most reasonable or the only reasonable limitation."  *Cornelius,* 473 U.S. at 808.  "In other words, consideration of a forum's special attributes is

---

[37] Because White Coat brings a Viewpoint Discrimination Claim, and the Court finds that the Advertising Policy lacks viewpoint neutrality as applied to White Coat, the Court need not analyze the Policy's reasonableness.

relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in the light of the characteristic nature and function of the particular forum involved." *Goulart*, 345 F.3d at 255 (internal quotation marks and citation omitted).  However, "[t]he First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Cornelius*, 473 U.S. at 811; *see also Lehman*, 418 U.S. at 304 (plurality opinion).

In *Lehman*, the Supreme Court upheld a prohibition on political advertisements in buses' "car card" interior advertising spaces.  418 U.S. at 303–04 (plurality opinion).  In doing so, the Supreme Court recognized three justifications for the city's prohibition on political ads.  *Id.* at 304.  First, short-term candidacy advertisements could prevent the transit system from securing long-term commercial advertisements that would bring in more revenue by virtue of their longer run-time.  *Id.*  Second, users could "be subjected to the blare of political propaganda."  *Id.* Finally, the ban prevented any inference of favoritism "in parceling out the limited space to eager politicians."  *Id.*  In his concurrence in the judgment, Justice Douglas agreed—not because political advertisements were especially objectionable, but because riders were a captive audience.  *Id.* at 307–08 (Douglas, J., concurring in the judgment).

*Lehman* predates modern public forum analysis, but the Supreme Court has incorporated that decision into the modern fora framework.  *See Krishna*, 505 U.S. at 678; *Cornelius*, 473 U.S. at 803–04.  Although the Court recognizes that the Supreme Court issued a plurality opinion in *Lehman*, the Court finds that *Lehman* remains valid and controls the facial viewpoint

discrimination outcome here.[38]   The D.C. Circuit, for instance, recently cited *Lehman* as

"Supreme Court precedent directly on point" in a case involving the Washington Metro Area

Transit Authority's ban on "issue oriented advertising."  *Am. Freedom Def. Initiative v. Wash.*

*Metro. Area Transit Auth.*, 901 F.3d 356, 368 (D.C. Cir. 2018) (rejecting facial viewpoint

discrimination claim because under *Lehman* "it is not facially viewpoint discrimination to ban

political advertising in a nonpublic forum"); *Am. Freedom Def. Initiative*, 698 F.3d at 888, 895

(upholding ban on "[p]olitical or political campaign advertising"); *Children of the Rosary*, 154

F.3d at 974, 980–81 (White, Retired Justice) (upholding advertising policy limiting acceptable

advertisements to " speech which proposes a commercial transaction"); *Lebron v. Nat'l R.R.*

*Passenger Corp.*, 69 F.3d 650, 654, 658 (2d. Cir. 1995) (upholding Amtrak's unwritten policy of

not allowing political advertising on remand from the Supreme Court), *opinion amended on*

*denial of reh'g en banc*, 89 F.3d 39 (2d Cir. 1995)).  At the very least, this long line of cases

provides a circumstance (or several given the multiple findings) "under which the law would be

valid."  *Greater Balt. Ctr. for Pregnancy Concerns, Inc.*, 721 F.3d at 282 (alterations and citation

omitted).  Because *Lehman* upheld a ban on political advertisements in "car card" interiors

(when evidence also covered exterior advertisements), the Court finds *Lehman* controlling.

> ### 2. *Mansky* Does Not Control the Facial Viewpoint Discrimination Claim Because it Considered a First Amendment Challenge Based on Reasonableness in Light of the Purpose Served by a Different Type of Nonpublic Forum:  A Polling Place

White Coat contends that the Advertising Policy is facially unconstitutional as to

viewpoint because "[t]he Supreme Court's recent decision in *Mansky* is directly on point and

---

[38] The Supreme Court also favorably cited *Lehman* in support of the proposition that bus advertisements are a nonpublic forum.  *See Mansky*, 138 S. Ct. at 1885–86 ("[O]ur decisions have long recognized that the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy.")

consistent with a long line of cases striking down amorphous restrictions on speech on First Amendment grounds." (Mem. Supp. White Coat Mot. Summ J. 16–17.) White Coat argues that these cases show that "GRTC's political ad prohibition is unconstitutional because it fails to 'articulate some sensible basis for distinguishing what may come in from what must stay out, and is not capable of reasoned application.'" (*Id.* (quoting *Mansky*, 138 S Ct. 1888–89).) The Court must reconcile *Mansky* and *Lehman* as to White Coat's facial Viewpoint Discrimination claim. The different forums at issue, evaluated under the applicable lenient reasonableness test, countermands White Coat's argument.

In *Mansky,* the Supreme Court considered whether Minnesota's "political apparel ban" preventing voters from wearing political insignia inside a polling place violated the Free Speech Clause on reasonableness grounds. 138 S. Ct. at 1882–83. Because "the apparel ban ma[de] no distinction based on the speaker's political persuasion," the only question was whether the ban was facially "'reasonable in light of the purpose served by the forum': voting." *Id.* at 1886 (quoting *Cornelius*, 473 U.S. at 806). By comparison, the purpose of the forum here is providing mass transportation in the greater Richmond area as a public service corporation. (GRTC Responses and Objections to Plaintiff's First Set of Interrogatories.)

The Supreme Court concluded in *Mansky* that the law did not survive the reasonableness test because of the "unmoored use of the term 'political' in the Minnesota law, combined with haphazard interpretations the State has provided in official guidance and representations to this Court." 138 S. Ct. at 1888. *Mansky* did not consider a viewpoint discrimination claim, which this Court confronts. *Id*. at 1886. Rather, *Manksy* considered whether a state's ban on political apparel at a polling pace was "reasonable in light of the purpose served by the forum: voting." *Id*. (internal quotation marks and citation omitted). The considerations for that nonpublic forum,

a polling place, differ from an evaluation of nature and characteristics of the nonpublic forum here, a bus system. Because *Mansky* considered a First Amendment claim based on reasonableness in a nonpublic forum that served a distinctly different purpose—voting versus providing public transportation—the Court finds it distinguishable from the facial Viewpoint Discrimination Claim White Coat raises here.

Given the recency of the *Mansky* decision, few courts have had the opportunity to apply its reasoning to prohibitions on political advertisements. The findings conflict. The Courts of Appeals for the District of Columbia and the Third Circuit, for instance, have considered *Lehman* and *Mansky* in the public transit context and reach diverging conclusions. In *American Freedom Defense Initiative v. Washington Metropolitan Area Transit Authority*, the Court of Appeals for the District of Columbia rejected a facial viewpoint discrimination claim raised against a transit system after the Supreme Court issued *Mansky*. 901 F.3d at 368. In a 2-1 decision, the D.C. Circuit Court found that *Lehman* controlled the outcome of the plaintiff's facial viewpoint discrimination claim against a transit system. Although the D.C. Circuit Court remanded the plaintiff's *reasonableness* claim based on *Mansky*, the appellate court had "no trouble" rejecting the facial viewpoint discrimination claim because "[t]here is Supreme Court precedent [*Lehman*] almost directly on point."[39] *Id.*

White Coat's argument that *Mansky* controls the outcome finds support in the United States Court of the Appeals for the Third Circuit. (Notice Suppl. Authority, ECF No. 36.) In *Northeastern Pennsylvania Freethought Society v. County of Lackawanna Transit System*, the

---

[39] The dissent would have deemed the case non-justiciable because the plaintiffs in *American Freedom Defense Initiative* did not amend their complaint based on the updated and more specific guidelines and policy adopted after litigation commenced. 901 F.3d at 377–78. Noting that the *Mansky* court observed that broad and indeterminate restrictions are more difficult to uphold than "narrower, more 'lucid' restrictions," the dissent counseled dismissal over remand given the state of the record. *Id.* at 377.

plaintiff challenged a public transit system's ban on religious and atheistic messages, which applied to both interior and exterior advertisements. 938 F.3d 424, 428, 440 n.4 (3d Cir. 2019). The Court of Appeals for the Third Circuit issued a 2-1 decision whose split reflects a reading different from that of the D.C. Circuit. The majority cabined *Lehman* as "a narrow exception to the general prohibition against subject-matter distinctions," and remarked that, unlike in *Lehman*, the captive audience concerns were not paramount because the court was considering exterior advertisements. *Id.* at 440. The majority held that because the transit system's "policy discriminates based on viewpoint" it violated the First Amendment. *Id.* at 428. The dissent disagreed, concluding that, applying *Lehman* and its progeny, the court should uphold the speech restriction in the public transit context because the desire to avoid disruption on busses for passenger safety provided an adequate connection between the forum's purpose and the speech limitation. *Id*. at 453 (Cowen, J., dissenting).

The split within and between these two appellate decisions demonstrates without question that both sides of the *Mansky* and *Lehman* debate rest on persuasive arguments. As to the facial viewpoint analysis, however, the Court concludes that *Lehman* controls the decision to ban political advertisements in the public transit context. Here, GRTC "offers space on the interior and exterior of its buses to advertisers." (Mem. Supp. White Coat Mot. Summ. J. 1, ECF No. 29.) GRTC's forum, particularly the interior advertising space (although subsequent courts have included outside advertisements in the captive audience analysis), implicates the captive audience concerns articulated in *Lehman*. GRTC also has a valid interest in its desire to avoid potentially disruptive or controversial political advertisements from its vehicles. The Court concludes that GRTC may lawfully consider the purpose of the nonpublic forum at issue here, safe public transportation, when adopting its Advertising Policy.

In conducting its own analysis, the Court concludes that the difference between a polling place and a transportation system commends application of *Lehman* rather than *Mansky*. The Supreme Court has highlighted that the type of nonpublic forum at issue raises different considerations. Transit systems, unlike spaces such as parks and sidewalks that have historically been used for congregation and discussion, have a utilitarian purpose that governments are entitled to maintain, at least where they have provided a non-speech-suppressive rationale for regulation. *Cornelius*, 473 U.S. at 803–04, 806 ("A speaker may be excluded from a nonpublic forum if he [or she] wishes to address a topic not encompassed within the purpose of the forum." (citing *Lehman*, 418 U.S. 298)). The Court of Appeals for the Ninth Circuit has recognized that transit systems have legitimate safety concerns that may be considered when formulating an advertising policy. *See Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 501 (9th Cir. 2015) (finding advertising restrictions constitutional where riders and drivers threatened not to ride or drive, citing legitimate safety concerns generated by the negative reaction to proposed advertisement). GRTC similarly contends that its intent in limiting political advertisements on its transit system is to "not allow any of its transit vehicles or property to become a public forum for dissemination, debate, or discussion of public issues." (Mem. Supp. GRTC Mot. Summ. J. 21, Ex. H Pace Dep. 35:4–18.) And GRTC asserts that its buses are "moving billboards" and it possesses an interest in limiting "controversial and inflammatory subject matter" that could endanger passengers. (Mem. Supp. GRTC Mot. Sum. J. 7.) While the record evidence is not overwhelming, common sense suggests that these are cognizable and valid, especially given the lenient reasonableness standard this Court must employ.[40]

---

[40] The Court recognizes, as does White Coat, the substantial overlap between the "reasonableness" standard and the "viewpoint discrimination" standard. For example, in *Child Evangelism*, the Fourth Circuit determined that a state actor's flyer policy violated the First

*Mansky* added more layers to First Amendment free speech jurisprudence, but absent guidance from the Fourth Circuit, the Court agrees with the D.C. Circuit that, given the analytical tie between the legal test and the forum to which it applies, *Mansky* did not change the standard for facial viewpoint discrimination claims in the public transportation context.  As the Supreme Court of the United States has remarked, a "facial challenge . . .  is, of course, the most difficult challenge to mount successfully" and will succeed only if a litigant can "establish that no set of circumstances exists under which the Act would be valid."  *Salerno*, 481 U.S. at 745.  While the Supreme Court recognized that legislative bodies "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out," *Mansky*, 138 S. Ct. at 1888, that does not render GRTC's ban facially unconstitutional when it comes to viewpoint discrimination.

As a result, the Court finds that *Lehman* and its progeny hold that public transit systems do not engage in *facial* viewpoint discrimination when implementing a ban on political advertising.  The Court will grant GRTC's Motion for Summary Judgment as to White Coat's *facial* Viewpoint Discrimination Claim.  The Court turns next to White Coat's Vagueness Claim.

### F.    Vagueness Claim

White Coat contends that the Advertising Policy's prohibition on political advertisements is unconstitutionally vague both facially and as applied to White Coat.  The Court first reviews the specific analytical framework for vagueness claims.

---

Amendment on the basis of viewpoint discrimination because it did not "provide adequate safeguards to *protect* against the improper exclusion of viewpoints."  457 F.3d at 384 (emphasis added).  The failure to provide adequate safeguards against viewpoint discrimination also lay at the heart of *Mansky*.  138 S. Ct. at 1891 ("Without [objective, workable standards] an election judge's own politics may shape his views on what counts as 'political.'")

1.      **Legal Standard:  First Amendment Vagueness Claims**

"A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what [speech] it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)); *see also Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 370–71 (4th Cir. 2012).  An unconstitutionally vague statute or regulation "fails to give adequate warning of what activities it proscribes or fails to set out 'explicit standards' for those who must apply it."  *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–14 (1972)).  Thus, all First Amendment vagueness challenges— whether facial or as applied—require the court to answer two questions:  whether the restriction gives a person reasonable opportunity to understand what it prohibits, and whether it creates a threat of arbitrary enforcement.

The void for vagueness doctrine does not "hold legislators to an unattainable standard when evaluating enactments in the face of vagueness challenges."  *Wag More Dogs*, 680 F.3d at 371.  The Court "can never expect mathematical certainty from our language."  *Id.* (citing *Hill*, 530 U.S. at 733 (citation and internal quotations omitted in original)).  The court instead "ask[s] whether the government's policy is 'set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.'"  *Id.* (quoting *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 749 (4th Cir. 2010)).

The limitations of language also mean that "[w]herever the law draws a line there will be cases very near each other on opposite sides."  *United States v. Wurzbach*, 280 U.S. 396, 399 (1930).  Imprecise language does not necessarily make a statute or regulation unconstitutionally

vague.  "The precise course of the line may be uncertain, but no one can come near it without knowing that he [or she] does so, if [that person] thinks."  *Id.* (citing *Nash v. United States*, 229 U. S. 373 (1913).  "Dictionary definitions and old-fashioned common sense facilitate the inquiry."  *Wag More Dogs*, 680 F.3d at 371 (citing *Imaginary Images*, 612 F.3d at 749; *United States v. Cullen*, 499 F.3d 157, 163 (2d Cir. 2007)).

The void for vagueness doctrine applies to both criminal and civil regulations.  *See*, *e.g.*, *City of Chicago*, 527 U.S. 41 (overturning a criminal city ordinance as unconstitutionally vague); *see also*, *Broadrick*, 413 U.S. 601 (considering a civil statute curtailing certain employees' rights to engage in political activity, ultimately finding it constitutional); *Wag More Dogs*, 680 F.3d 359 (city zoning laws); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426 (4th Cir. 2013) (school dress codes).  The fact that a regulation requires interpretation does not make it vague. *Rose v. Locke*, 423 U.S. 48, 49–50 (1975).

**2.     The Advertising Policy is Unconstitutionally Vague As Applied to White Coat Because the Record Shows Inconsistent and Arbitrary Application**

Despite the Advertising Policy's avowal of consistent application and objective enforcement, the Court finds the Advertising Policy unconstitutionally vague *as applied* because: (1) the record shows a person of ordinary intelligence could not readily determine whether the policy allows or prohibits advertisements similar to that proposed by White Coat; and, (2) the record evinces arbitrary enforcement of the Advertising Policy as applied to White Coat.[41]

---

[41] *Mansky* reviewed only a *facial* reasonableness claim (not an as-applied vagueness challenge) because the parties agreed that the policy there was viewpoint neutral.  138 S. Ct. at 1886.  As noted above, this two-part vagueness evaluation of objective reasonableness and arbitrary enforcement mirrors the Fourth Circuit's evaluation of unbridled discretion and "sufficient criteria to prevent viewpoint discrimination."  *Child Evangelism*, 457 F.3d 376, 387; *see also Mansky*, 138 S. Ct. at 1888 (citing *Cornelius*, 473 U.S. at 808–09) (the state "must be

The record demonstrates that a person of ordinary intelligence could not consistently apply the ban on "political" advertisements when deciding to accept or reject White Coat's advertisement. Nor could one anticipate what is prohibited. No person of ordinarily intelligence could know "what falls within, or may fall within" one of the prohibited categories such as the ban on political advertising. (2013 Adver. Policy 1-2.)

At the outset, GRTC never defined the word "political" in the Advertising Policy, and "there exist[s] no specific written guidance documents other than the Board minutes and the policy itself." (Mem. Supp. GRTC Mot. Sum. J. 7.) Additionally, GRTC's definition of the term "political" has changed several times over the course of the litigation. In its pleadings on the Motion to Dismiss, GRTC relied on the first definition of "political" in Webster's New Collegiate Dictionary (the "Webster Definition): "of or relating to government, a government, or the conduct of government." (Mem. Supp. GRTC Mot. Dismiss 12–13, ECF No. 9 (quoting Webster's New Collegiate Dictionary 883 (1981)).) GRTC also mentioned additional definitions: "concerned with the making as distinguished from the administration of governmental policy" and "of, relating to, or involving politics and esp[ecially] party politics." (*Id.* at 12 n.3 (quoting Webster's New Collegiate Dictionary 883 (1981)).) Yet the record shows GRTC accepted advertisements that were expressly political in nature under the Webster Definition. The advertisement for the Vice Presidential Debate is a "political" advertisement because it is "of or relating to government . . . or the conduct of a government." (*Id.* 12–13 (quoting Webster's New Collegiate Dictionary 883 (1981)).) Moreover, the record clearly

---

able to articulate some sensible basis for distinguishing what may come in and why must stay out").

The overlap of tests again becomes apparent. A policy is less reasonable when the ban is enforced on a haphazard or erratic basis. *Mansky*, 138 S. Ct. at 1888–90. And the attempt to apply the policy on an evenhanded basis "must be guided by objective, workable standards." *Id.* at 1891.

demonstrates that a party submitting an advertisement to GRTC did not have notice of these definitions.

During litigation, GRTC tried to clarify its definition.  Perhaps recognizing that the Supreme Court viewed the breadth of the Webster's Definition of "political" with disfavor in *Mansky*, GRTC abandons it on Summary Judgment.  *See* 138 S. Ct. at 1888, 1890 ("Under a literal reading of those definitions, a button or T-shirt merely imploring others to 'Vote!' could qualify").  GRTC now defines political speech as that which "specifically expresses an identifiable viewpoint" and only that viewpoint and defines a political action group as one that engages in "'specific targeted policy advocacy' that is related to only one side of political issue." (Mem. Supp. GRTC Mot. Sum. J. 21) (quoting Pace Dep. 37:19–22)).  In doing so, GRTC appears to change its definition of "*political*" to "*partisan*," where partisan reflects what GRTC deems to be controversial.[42]  GRTC does not advance its case by putting forth these varying definitions which point toward the Advertising Policy's lack of clarity and authorization of arbitrary enforcement as applied to White Coat.  Nothing suggests that the inconsistent decisions stemmed from anything other than an attempt to apply an elusive policy, but the Court notes, as the Supreme Court did in *Mansky*, that even the best-intentioned judgments run the risk of inconsistency where discretion runs unguided "by objective, workable standards."  138 S. Ct. at 1891.

Given the evolving definition of "political" even before this Court, GRTC's application of the Advertising Policy "turn[s] in significant part on the background knowledge and media

---

[42] Partisan means a supporter of a party, cause, or person.  *See Merriam-Webster Dictionary* (2020) (partisan, noun, "a firm adherent to a party, faction, cause, or person") (partisan, adjective, "feeling, showing, or deriving from strong and sometimes blind adherence to a particular party, faction, cause, or person: exhibiting characterized by, or resulting from partisanship").

consumption of the particular [official] applying it." *Id.* at 1890.  In some circumstances, GRTC's Director of Communications admitted that interpreting the Policy varied based on her level of familiarity with the content of the advertisement.  (Pace Dep. 155–57.)  When VCU sought to run an advertisement promoting its contemporary art institute that seemed to advocate for "Free Speech" and "Free Expression," Pace relied on and adopted the perspective of her peer, Anthony Carter, who presumably had familiarity with modern art.  (*Id.* 156:7–19.)  If either Pace or Carter had determined that the advertisement was advocating for free speech or free expression, then it would "not be viewpoint neutral advertising" and would violate the Advertisement Policy.  (*Id.* 157:3–4.)  Pace undertook her website review and internal verification without written protocol, meaning that no advertiser could know those actions contributed to a rejection.  As a result, the policy, as applied, would not provide a person of ordinary intelligence a reasonable opportunity to understand what speech it prohibits.

In addition to failing to inform a person of ordinary intelligence what speech is prohibited, the record shows that the Advertising Policy allowed for arbitrary enforcement of the ban on political advertisements as applied to White Coat.  Here, GRTC rejected the White Coat advertisement because Pace considered the organization an "animal cruelty related nonprofit," which was, in her opinion, "a political action group."  (*Id.* 36–37.)  At nearly the same time, GRTC allowed Gracie's Guardians, a Pitbull rights group fighting against animal cruelty, to run an advertisement specifically imploring the community to not "stand for cruelty" because Pace did not "see . . . political action group information on [their website]."  (*Id.* 191:5–6.)  She instead labeled Gracie Guardian's advocacy for "spaying and neutering" to be a public service announcement.  Because the Advertising Policy requires GRTC officials to inquire into the past-

speech of anyone seeking to submit an advertisement, such investigations allowed arbitrary application of the Policy.

Moreover, after GRTC rejected White Coat's advertisement, White Coat sought clarification from GRTC regarding its decision under the terms of the Advertising Policy. GRTC did not offer White Coat any definition of "political," but did suggest—without explaining why—that the advertisement might run as a public service announcement if co-sponsored by Richmond Animal Care and Control.  This demonstrates not only arbitrary enforcement, but also shows that White Coat was not on notice as to what was prohibited even when they asked.  Although *Lehman* supports GRTC's argument that it may restrict certain advertisements, that case also recognized that an advertising policy applied in an inconsistent and arbitrary manner may violate the First Amendment.  *See* 418 U.S. at 304 ("[T]he policies and practices governing access to the transit system's advertising space must not be arbitrary, capricious, or invidious").

Because the record shows that, as applied to the decision to reject White Coat's advertisement while accepting other advertisements that were political in nature, the Advertising Policy resulted in arbitrary enforcement and did not allow a person of ordinary intelligence to readily determine what the ban on political advertising prohibited.  As a result, the Court will grant White Coat's Motion for Summary Judgment with regard to its as-applied Vagueness Claim.

3.       **The Advertising Policy is Facially Constitutional under a Vagueness Analysis**

The complications created by the intersecting standards applicable to this First Amendment analysis becomes most evident when evaluating *facially* unconstitutional vagueness of the GRTC Advertising Policy.  This is largely true because one way in which a plaintiff may

establish facial vagueness is by demonstrating that "no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep." *Greater Balt. Ctr. for Pregnancy Concerns, Inc.*, 721 F.3d at 282 (alterations omitted). A "facial challenge . . . is . . . the most difficult challenge to mount successfully" and will succeed only if a litigant can "establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745.

The consistent application of *Lehman* to First Amendment review of advertising in public transportation systems—finding a ban on political advertising facially constitutional—delivers an incontrovertible circumstance (or set of instances examined in a line of cases) under which GRTC's Advertising Policy "would be valid." With *Lehman* and its progeny intact,[43] the Court cannot deem GRTC's policy facially unconstitutional on vagueness grounds. Simply put, a significant number of courts continue to interpret *Lehman* as allowing bans on political advertisements in busses or mass transit forums. Such a ban, then, becomes facially valid under the law.

**4.     Courts are Trending Toward a Thoughtful Application of the Facial Vagueness Test Rather than *Lehman* When Evaluating Whether an Advertising Ban in a Transit System is Facially Unconstitutional**

Despite this binding precedent, and especially in the absence of Fourth Circuit guidance, the Court recognizes that *Lehman's* unbending application to assessing the constitutionality of

---

[43] *See, e.g.*, *Am. Freedom Def. Initiative*, 901 F.3d at 368 (rejecting facial viewpoint discrimination claim because under *Lehman* "it is not facially viewpoint discrimination to ban political advertising in a nonpublic forum"); *Am. Freedom Def. Initiative*, 698 F.3d at 888, 895 (upholding ban on "[p]olitical or political campaign advertising"); *Children of the Rosary*, 154 F.3d at 974, 980–81 (White, Retired Justice) (upholding advertising policy limiting acceptable advertisements to " speech which proposes a commercial transaction"); *Lebron v. Nat'l R.R. Passenger Corp.*, 69 F.3d 650, 654, 658 (2d. Cir. 1995) (upholding Amtrak's unwritten policy of not allowing political advertising on remand from the Supreme Court), *opinion amended on denial of reh'g en banc*, 89 F.3d 39 (2d Cir. 1995)).

advertising bans on political advertisements in transit systems has come under challenge in the forty-six years since *Lehman* came down.  The challenges are grounded in strong First Amendment jurisprudence with some logical force.  Any court retains its obligation to determine whether a state actor's restriction on speech "on a case-by-case basis in light of the facts and circumstances of each particular forum."  *NAACP*, 834 F.3d at 448.

So while there can be no debate that the *Lehman* plurality upheld a restriction on political advertising in the public transit context, some courts have begun to recognize that "the fact that *Lehman* upheld a policy of excluding political advertisements in public buses hardly determines the [constitutionality] of such a restriction for all time."  *Air Line Pilots Ass'n, Intern v. Dep't of Aviation of City of Chicago,* 45 F.3d 1144, 1159 (7th Cir. 1995); *see also Freethought Soc'y,* 938 F.3d at 439–440 ("*Lehman* is 'properly . . . viewed as [a] narrow exception[] to the general prohibition against subject-matter distinctions.'" (quoting *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 539 (1980)).

The Fourth Circuit has not made such a finding.  The Fourth Circuit allows courts to strike down regulations as impermissibly vague under the longstanding test that articulates just either of two reasons:  "[f]irst, a regulation can fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, a regulation can authorize or even encourage arbitrary and discriminatory enforcement."  *Wag More Dogs*, 680 F.3d at 370–71 (4th Cir. 2012) (internal quotation marks and citations omitted).  Generally speaking, "[s]triking down ordinances (or exceptions to the same) as facially void for vagueness is a disfavored judicial exercise."  *Schleifer by Schieffer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998).

But recently, some courts suggest that a "third related inquiry" emanating from the Supreme Court in its 2018 *Mansky* decision exists:  whether the discretion vested in a government official to permit or prohibit speech is "guided by objective, workable standards." *Am. Freedom Def. Initiative*, 901 F.3d at 372.  The D.C. Circuit Court remanded for a determination whether the guideline is capable of reasoned application.  *Id.* at 373.  This reasonableness query seems grounded on legitimate concerns raised by many courts.  Invoking considerations raised by the Fourth Circuit and others, the D.C. Circuit Court asked the district court to determinate whether the guideline is capable of reasoned application or provides "no meaningful constraint upon its exercise of the power to squelch" amounting to "unbridled discretion."[44]  *Id.* at 372.

Here, should the test of whether the Advertising Policy failed "to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," the policy would signal facially vague unconstitutionality.  Even though *Mansky* considered a facial First Amendment challenge on reasonableness grounds, the analysis underscoring reasonableness conceptually overlaps with the elements of a First Amendment vagueness challenge.  *Mansky*, like the Policy at issue here, involved a ban of anything deemed "political."  As the Supreme Court explained in *Mansky*, the term "political" encompasses a wide variety of speech, making it practically incapable of definition.  138 S. Ct. at 1888 (observing that the term "political" can encompass anything of or relating to government, a government, or the conduct of governmental affairs, or anything of, relating to, or dealing

---

[44] Echoing earlier observations by the Fourth Circuit, the D.C. Circuit observed that "the overlap in analysis between unbridled discretion and vagueness is clear; both doctrines require a court to determine whether a decisionmaker's exercise of discretion in allowing or disallowing speech is based upon objective and clear standards."  *Am. Freedom Def. Initiative*, 901 F.3d at 372.  These interrelated analyses complicate First Amendment jurisprudence but not, as the Fourth Circuit has noted, *necessarily* enough to reject the approach.

with the structure or affairs of government, politics, or the state).  Similarly, in the case at bar, without further guidance or explanation for decisionmakers or potential advertisers interpreting the Policy, the term "political" may encompass a wide variety of speech, as shown through White Coat's hypothetical advertisements and the record before the Court.

GRTC's Advertising Policy offers an unmoored use of the word "political" without definition, and it offers no guidance whatsoever as to what "political," "political action group," or "public service announcement" could encompass.  No person of ordinary intelligence could understand what speech the Policy prohibits.

Similarly, the Policy could authorize arbitrary enforcement.  For instance, to determine what may be deemed political GRTC officials attempt to learn more about the sponsoring organization before accepting or rejecting an advertisement.  However, an official's unchecked subjective determination of both a "political ad" or a "political action group" can result in arbitrary enforcement of the Policy.  White Coat proffered hypothetical advertisements to suggest what the Advertising Policy might preclude, such as whether "No Army" or "Go Army" advertisements would be permissible, or whether a commercial advertisement from Walmart.com might trigger "political" concerns.  These hypothetical advertisements reveal the unbridled discretion that decisionmakers for GRTC may exercise when categorizing an advertisement as political or nonpolitical, without allowing an ordinary person to understand what may be excluded.  As a result, the Court sees this policy as possibly unconstitutionally vague on its face.

And even *Lehman* upheld the city's restriction on political advertisements while also recognizing that the city must not limit advertisements in an arbitrary, capricious, or invidious manner.  418 U.S. at 303–04.  In so doing, the Supreme Court expressly recognized

that an advertising policy applied in an inconsistent and arbitrary manner might violate the First Amendment. *Id.* at 304. This case, then, does not necessarily present the same question as *Lehman*, but an application that the *Lehman* plurality foresaw but left open.

While the Court sees the lack of guidance on what advertisers or officials alike may deem political, it is nonetheless bound to follow *Lehman* in finding that the Policy at bar is not facially unconstitutional as vague. For these reasons, the Court will grant GRTC's Motion for Summary Judgment as to its *facial* Vagueness Claim.

## VI. Injunctive Relief

Because the Court finds the Advertising Policy constitutional on its face, it will not grant White Coat's request for declaratory relief. Because the Court finds the Advertising Policy unconstitutional as applied to White Coat, the Court will grant White Coat's request for injunctive relief.

Federal Rule of Civil Procedure 65(d)(1)(C) requires that every order granting an injunction "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). "The rule expressly proscribes the issuance of an injunction which describes the enjoined conduct by referring to another document. This is more than a technical requirement; its purpose is to give notice of the acts prohibited." *Thomas v. Brock,* 810 F.2d 448, 450 (4th Cir. 1987).

Consistent with this Memorandum Opinion, the Court will grant injunctive relief to White Coat and enjoin GRTC from inconsistently accepting and rejecting advertisements, as applied to White Coat, that may be considered political in contravention to the terms of its Advertising Policy.

### VII.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part White Coat's

Motion for Summary Judgment, (ECF No. 25), and grant in part and deny GRTC's Motion for

Summary Judgment, (ECF No. 30.)

An appropriate Order shall issue.

_____
/s/
M. Hannah Lauck
United States District Judge

Date: May 30, 2020
Richmond, Virginia